# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT



RICHARD H. KREGER, BRUCE C. RYAN and )
RHK CAPITAL, LLC )
     Plaintiffs, )
                                   ) Civil Action No. 3:21-CV-424-CSH
v. )
                                   )
WILLIAM H. MCCANCE, SUSAN M. LEMOINE,)
ADVISORY GROUP EQUITY SERVICES, LTD., )
TAG GROUP, INC., and )
TRUST ADVISORY GROUP, LTD (f/k/a Trust )
Advisory Services, Ltd.) )
     Defendants. )
                                   )

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

Defendants, William H. McCance ("McCance"), Susan M. LeMoine ("LeMoine"), Advisory Group Equity Services, Ltd.("AGES"), TAG Group, Inc. ("TGI"), and Trust Advisory Group, Inc. ("TAG") (collectively, "Defendants" or "TAG-AGES"), submit this Memorandum in Opposition to the Motion for Temporary Restraining Order filed by Richard H. Kreger ("Kreger"), Bruce C. Ryan ("Ryan"), and RHK Capital, LLC ("RHK")(collectively, "Plaintiffs").

## I.    FACTUAL BACKGROUND

In mid-2016 Mr. McCance, as president of TAG-AGES, entered into negotiations with Source Capital Group, Inc. ("Source") and David Harris, Source's sole shareholder, to acquire Source. McCance, TAG-AGES, Source, and Harris memorialized these negotiations in a Business Transfer Agreement ("BTA") signed by both Mr. McCance and Mr. Harris on or around November 30, 2016. A copy of this agreement is attached as **Exhibit A**.

In anticipation of this acquisition, TAG-AGES filed a Continuing Member Application with FINRA as required under FINRA Rule 1017.

On February 1, 2017, an arbitration panel in FINRA Arbitration No. 16-00147, stylized as *William Lashlee, Keith McCrea, Joyce McCrea, Justin McCrea, The 2010 McCrea Family Revocable Trust v. Source Capital Group*, issued an Award finding Source liable and awarding Claimants $1,250,000 in damages. This Award resulted in Source violating their net capital obligations pursuant to section 15(c)(3) under the Securities Exchange Act of 1934.

Upon violating the Net Capital Rule, Source had to "suspend all business operations" pursuant to FINRA Rule 4110(b)(1). This did not just effect Source: every financial advisor registered with Source were also required to suspend their securities business. By violating the Net Capital Rule, Source essentially set their advisors to drift in FINRA purgatory.

As explained more fully below, violating the Net Capital Rule also rendered the BTA invalid. TAG-AGES could no longer acquire Source as originally contemplated. McCance and TAG-AGES offered the financial advisors still registered with Source a life preserver: they agreed to assist every advisor in registering with TAG-AGES and transferring their client accounts.

On February 3, 2017 Kreger relinquished his registration with Source and affiliated with TAG-AGES on February 6, 2017. In connection with his registration with TAG-AGES Kreger executed a Registered Representative Agreement, a Form U-4 filed with FINRA's Central Registry Depository, and an Associate Information Form.

On February 6, 2017 Ryan relinquished his registration with Source and affiliated with TAG-AGES on or around February 7, 2017. He also executed a Registered Representative Agreement, a Form U-4, and an Associate Information Form in connection with his onboarding with TAG-AGES.

On April 10, 2017 FINRA suspended Source's membership under FINRA Rule 9554 for "failure to comply with an arbitration award or settlement agreement or to satisfactorily respond to a FINRA request to provide information concerning the status of compliance."

On November 30, 2020, Mr. McCance provided both Kreger and Ryan with notice that he would be terminating their supervisory roles and corresponding overrides.

Kreger resigned from TAG-AGES in early December 2020 and Ryan resigned in early February 2021. They affiliated with Noble Capital Markets, Inc. ("Noble") in late January 2021.

## II.   ANALYSIS AND ARGUMENT

### A. The Legal Standard

"Temporary restraining orders and preliminary injunctions are extraordinary and drastic remedies, which are 'never awarded as of right,' or 'as a routine matter.'" *Whitfield v. Lopez*, No. 15-CV-4827 (DLI) (LB), 2015 WL 6128866, at *2 (E.D.N.Y. Oct. 16, 2015) (citations omitted).

"In the Second Circuit, where a party seeks preliminary injunctive relief ... courts apply the four-factor test set forth by the Supreme Court in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 390, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006)." *Mrs. U.S. Nat. Pageant, Inc. v. Miss U.S. Org., LLC*, 875 F. Supp. 2d 211, 226 (W.D.N.Y. 2012). Under this test, a district court must determine that a plaintiff has shown:

> (1) a likelihood of success on the merits; (2) that absent an injunction [the p]laintiff is likely to suffer irreparable injury that cannot be remedied with monetary damages; (3) that the balance of hardships tips in favor of [the p]laintiff; and (4) that "the public interest would not be disserved" by the issuance of an injunction. ...

Furthermore, this four-part test is also applied by courts in reviewing a request for a temporary restraining order because, "[i]n the Second Circuit, the standard for a temporary restraining order is the same as for a preliminary injunction." *Wik v. City of Rochester*, No. 07-

CV-6541-CJS, 2008 WL 11251593, at *1 (W.D.N.Y. Nov. 6, 2008); ... see also *Comprehensive Cmty. Dev. Corp. v. Sebelius*, No. 12 Civ. 0776 (PAE), 2012 WL 738185, at *5 (S.D.N.Y. Mar. 7, 2012) ("[A] plaintiff seeking a temporary restraining order 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" (citation omitted)).

*Rush v. Hillside Buffalo, LLC*, 314 F. Supp. 3d 477, 483–84 (W.D.N.Y. 2018)

As laid out more fully below, Plaintiffs have not shown they would suffer irreparable harm, that the balance of equities tip in their favor, that an injunction is in the public interest or that they would succeed on the merits. Therefore, as a matter of law, they cannot meet their burden. Their entire argument relies on invalid agreements, demands that violate the rules and regulations governing the securities industry, and claims of irreparable harm that could be easily remedied by their own actions or monetary damages.

### B. The Business Transfer Agreement Is Not Valid

The BTA was negotiated and contemplated between two individuals: William McCance and David Harris. Neither Kreger nor Ryan are signatories to this agreement, and, as they were privy to the negotiations surrounding the BTA, they were fully aware they were not signatories and were never contemplated to be signatories. Further, even if Plaintiffs were signatories to the BTA, the Agreement is clear: the transactions contemplated in the BTA hinged on FINRA approving the transaction. On the first page of the BTA after the table of contents listing, the following language is germane:

WHEREAS, the parties intend that the Closing of the transfer transactions described in this Agreement shall take place upon receipt by the parties of the required Approvals, including approvals by the Financial Industry Regulatory Authority ("FINRA").

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Transferor and the Transferee hereby agree as follows:

## ARTICLE I.  TRANSFER  OF BUSINESS

1.1 Transfer. . On the terms and subject to the conditions set forth in this Agreement, the Transferor shall, subject to FINRA Approval, convey, assign, transfer and deliver to the Transferee, and the Transferee shall acquire from the Transferor, for the consideration specified in Section 2.1 hereof, all of the Transferor's right, title and interest in and to the Business of Source as more particularly described in Exhibit A attached hereto.

The BTA specifically contemplated FINRA's requirements under Rule 1017 as a condition precedent:

## ARTICLE VI. CONDITIONS OF CLOSING

6.1 Conditions to Obligations of the Transferee. Unless waived, in whole or in part, in writing by the Transferee, the obligations of the Transferee to close and effect the transactions contemplated by this Agreement shall be subject to the satisfaction at or prior to the Closing Date, as described in this Section 6.1 of each of the following conditions:

(a) Required Approvals. The parties shall have obtained all of the necessary governmental and self regulatory approvals or consents to this Agreement, including thenecessary state regsitratons as necessary,  and the transactions contemplated hereby including the approval of the Financial Services Regulatory Authority, Inc.. (the "FINRA Approval") (collectively the "Required Approvals"). The Transferee shall file with FINRA and use its best efforts to prosecute a Rule 1017 application covering both the Transferor and Transferee and containing such information about the Transferor as shall have been provided to it by the Transferor ( the "Transferor Information"). The Transferee shall have no responsibity/liability for the accuracy or acequacy of such Transferor Information. The Transferor agrees to indemnify and hold hamless the Tranferee from and against all loss, liability claim or expense arising from the provision of such Transferor Information.

(b) Representations and Warranties to be True. The representations and warranties of the Transferors contained in this Agreement shall be true and correct in all material respects on the Closing Date with the same effect as though made at such time. The Transferors shall have performed all of their obligations and complied in all material respects with all covenants required by this Agreement to be performed or complied with by them on or prior to the Closing Date.

FINRA Rule 1017(h)(1) sets forth the standards for approving the Continuing Member

Application:

(h) Department Decision

(1) The Department shall consider the application, the membership interview, other information and documents provided by the Applicant or obtained by the Department, the public interest, and the protection of investors. In rendering a decision on an application submitted under Rule 1017(a), the Department shall consider whether the Applicant and its Associated Persons meet each of the standards in Rule 1014(a). Where the Department determines that the Applicant or its Associated Person are the subject of any of the events set forth in Rule 1014(a)(3)(A) and (C) through (E), a presumption exists that the application should be denied. The Applicant may overcome the presumption by demonstrating that it can meet each of the standards in Rule 1014 (a), notwithstanding the existence of any of the events set forth in Rule 1014(a)(3)(A) and (C) through (E).

Once Source violated the Net Capital Rule, the Application would be presumptively denied, inasmuch as Source could no longer meet the Standards for Admission under FINRA Rule 1014 (a)(3)(C), which provides:

an Applicant or Associated Person is the subject of a pending, adjudicated, or settled regulatory action or investigation by the SEC, the Commodity Futures Trading Commission, a federal, state, or foreign regulatory agency, or a self-regulatory organization; an adjudicated, or settled investment-related private civil action for damages or an injunction; or a criminal action (other than a minor traffic violation) that is pending, adjudicated, or that has resulted in a guilty or no contest plea or an Applicant, its control persons, principals, registered representatives, other Associated Persons, any lender of 5 percent or more of the Applicant's net capital, and **any other member with respect to which these persons were a control person or a 5 percent lender of its net capital is subject to unpaid arbitration awards, other adjudicated customer awards, or unpaid arbitration settlements;** (emphasis added).

Given Source's status in February 2017, it would have been impossible for either TAG-AGES or Source to perform in accordance with the BTA. As the BTA is invalid there is nothing in the agreement requiring restraint or injunctive relief. Accordingly, Plaintiffs' Motion should be denied.

## C. The OSJ Manager Agreement Is Not Valid

As an exhibit to the BTA, the OSJ Manager Agreement ("OSJ Agreement") is as equally invalid as the governing document. That said, even if it were not, Kreger and Ryan were not

signatories to the OSJ Agreement and their flagrant attempts to alter the OSJ Agreement and misrepresent to this Court their involvement colors the entirety of their claim.

Attached as the sole exhibit to Plaintiffs' Verified Complaint is Exhibit B to the BTA. The signatory page as filed with this Court is embedded here:

OSJ Manager and a duly authorized officer of BD.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

ADVISORY GROUP EQUITY SERVICES, LTD.

By
   William H. McCance, President

TRUST ADVISORY GROUP, LTD.)

By
   William H. McCance, President

OSJ MANAGER:

[NAME]
DAVID W. HARRIS    BRUCE C. RYAN    RICHARD H. KREGER

Embedded below is the legitimate signatory page, kept in accordance with TAG-AGES books and records requirements under FINRA and the SEC:

OSJ Manager and a duly authorized officer of BD.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set
forth above.

ADVISORY GROUP EQUITY SERVICES, LTD.

By

    William H. McCance, President

TRUST ADVISORY GROUP, LTD.

By

    William H. McCance, President

OSJ MANAGER:

{NAME}

Neither Kreger nor Ryan contemporaneously signed the agreement with McCance and
Harris in November 2016. They were never a party to the OSJ Agreement.

Even if the OSJ Agreement were valid, and Defendants adamantly deny that it is, TAG-
AGES has not violated any terms in the agreement.

**D.  The Bulk Transfer Of Accounts Is Only Allowed In Limited Circumstances**

Contrary to the assertions in Plaintiffs' Memorandum, a bulk transfer of accounts from
TAG-AGES to Noble is not only impermissible under FINRA rules and regulations, it would result
in client harm and confusion, and financial harm to the financial advisors registered with TAG-
AGES.

The FINRA/NASD Notice to Members ("NTM") 02-57 cited, but not quoted, in Plaintiffs' Memorandum provides guidance and clarification to FINRA Rule 11870 which governs the transfer of customer accounts. NTM 02-57 states:

> NASD rules do permit member firms to use "negative response letters" to obtain authorization to take certain actions on behalf of their customers without obtaining affirmative consent, but only in limited circumstances. NASD Rule 2510(d) allows a member to use negative response letters in certain situations to effect the bulk exchange of a customer's money market mutual fund for a different fund without the affirmative consent of a customer, provided certain conditions are met.

The NTM then elaborates on those "limited circumstances":

> The staff generally believes the use of negative response letters may be appropriate in the following circumstances:
>
> - **A Member Experiencing Financial or Operational Difficulties** - An introducing firm that is experiencing financial or operational difficulties may seek the transfer of all of its customer accounts to another introducing firm using negative response letters;
>
> - **An Introducing Firm No Longer in Business** - When an introducing firm has gone out of business, the clearing firm may effect the transfer of all of the introducing firm's customer accounts to another introducing firm using negative response letters;
>
> - **Changes in a Networking Arrangement with a Financial Institution** - Upon the conclusion or termination of a networking arrangement with a financial institution pursuant to NASD Rule 2350, a member may seek the transfer of all customer accounts established pursuant to the networking arrangement to a new firm with which the financial institution has formed a networking arrangement using negative response letters;
>
> - **Acquisition or Merger of a Member Firm** - When a firm is acquired by or merges with another firm, the firm originating the accounts may seek the transfer of all of its accounts to the new firm using negative response letters; and
>
> - **Change in Clearing Firm by an Introducing Firm** - When an introducing firm decides to enter into a clearing arrangement with a different firm, the introducing firm may use negative response letters to transfer customer accounts to the new clearing firm.

Plaintiffs do not point to which of these "limited circumstances" apply here because, simply put, none do. In nearly all circumstances, when financial advisors depart one brokerage firm for another, they must "re-paper" their accounts by having their clients complete and execute new account forms and other account opening documents. Once complete, the new firm initiates the account transfer via the ACAT system and the customer accounts are delivered to the receiving firm.

Here, not only do Plaintiffs' not have a valid reason for a bulk transfer of customer accounts, a bulk transfer would also cause irreparable harm to those customers and the financial advisors still managing their accounts. Plaintiffs are demanding that TAG-AGES assist in the bulk transfer of both financial advisors and their underlying customer accounts. Each financial advisor previously under the RHK office are independent contractors. Their registration agreements are with TAG-AGES, and TAG-AGES alone. There is not, to Defendants' knowledge, any underlying agreement between these advisors and Plaintiffs. These financial advisors are under no obligation to follow Kreger and Ryan to Noble. Moreover, as independent contracts, the financial advisors, and not Plaintiffs', have the proprietary interest in their underlying books of business and the relationship with their customers.

Additionally, rather than order TAG-AGES to facilitate a bulk transfer, violating FINRA rules and regulations, there is a simpler solution: Plaintiffs can help their clients fill out new account forms with Noble and transfer their accounts via the ACAT system. This is the industry standard and is not, as Plaintiffs suggest, cumbersome, time-consuming, or expensive. For these reasons, Plaintiffs' demand that Defendants' assist in the bulk transfer of accounts should be denied.

**III.** <u>**Conclusion**</u>

Wherefore, the Defendants, William H. McCance, Susan M. LeMoine. Advisory Group Equity

Services, Ltd., TAG Group, Inc., and Trust Advisory Group, Ltd. deny Plaintiffs' Motion for

Temporary Restraining Order in its entirety.

Dated: 31 March 2021

Respectfully Submitted,

**William H. McCance, Susan M. LeMoine,**
**Advisory Group Equity Services, Ltd., TAG**
**Group, Inc., and Trust Advisory Group, Ltd.**

By and through their attorneys,

Kirsten Patzer (phv11173)
Michael P. Kenney (ct26768)
FREEMAN MATHIS & GARY LLP
185 Asylum Street, 6th Floor
Hartford, Connecticut 06103
Telephone; 959.202.4978
kpatzer@fmglaw.com
michael.kenney@fmglaw.com

# EXHIBIT A

# BUSINESS TRANSFER AGREEMENT

**SOURCE CAPITAL GROUP, INC.**
**DAVID W. HARRIS**
**"TRANSFEROR "**

**ADVISORY GROUP EQUITY SERVICES, LTD.**
**TRUST ADVISORY GROUP, LTD.,**
**"TRANSFEREE"**

**NOVEMBER 30, 2016**

1

# TABLE OF CONTENTS

ARTICLE I –Transfer  of Business
      1.1 Transfer
      1.2 No Assumption of Liabilities

ARTICLE II –Consideration and Closing
      2.1 Consideration Consideration
      2.2 Closing

ARTICLE III –TRANSFEROR'S REPRESENTATIONS AND WARRANTIES
      3.1 Status of Transferor
      3.2 Financials
      3.3 Tax Returns; Taxes
      3.4 Real and Personal Property
      3.5 Contracts; Powers of Attorney
      3.6 Insurance
      3.7 Officers and Directors; Employment Relationships
      3.8 Transactions with Affiliates
      3.9 No Misleading Statements or Omissions
      3.10 Litigation; Compliance With Law
      3.11 Absence of Restrictions and Conflicts
      3.12 Licensing
      3.13 Governmental Approvals
      3.14 Business Registrations
      3.15 Brokers and Finders

ARTICLE IV – TRANSFEREE'S REPRESENTATIONS AND WARRANTIES
      4.1 Status of the Transferee
      4.1 Execution, Delivery and Performance
      4.2 Effect of Agreement
      4.3 Brokers and Finders

ARTICLE V - COVENANTS
      5.1 Covenants of the Transferor
          5.1.1 Ordinary Course
          5.1.2 No Modification of Contracts
          5.1.3 No Transfers, Etc.
          5.1.4 No Issue of Business
          5.1.5 Actions of Transferor
          5.1.6 Appointment of Certain Individuals; Establishment of OSJ
          5.1.7 Officers and Directors
          5.1.8 No Operational Duties; Registered Representatives

5.1.9 Establishment of Clearing Arrangements
5.1.10 Survival of Registered Representative Agreements and Clearing Arrangements
5.1.11 Amendment of By-Laws.

5.2 Covenants of the Transferee
5.2.1 ActionsofTransferee
5.2.2 Individual Business of Selling Shareholder
5.2.3 FINRA Payment

ARTICLE VI -CONDITIONS OF CLOSING
6.1 Conditions to Obligations of the Transferee
6.2 Conditions to Obligations of the Transferor

ARTICLE VII TERM; TERMINATION; SURVIVAL
7.1 Term; Termination
7.2 Survival of Representations, warranties and Covenants
7.3 Indemnification by the Transferor
7.4 Indemnification by the Transferee
7.5 No Indemnification
7.5 Notice and Opportunity to Defend

ARTICLE VIII -MISCELLANEOUS PROVISIONS
8.1 Certain Defined Terms
8.2 Notices
8.3 Waiver and Amendment
8.4 Governing Law
8.5 Captions; Certain Terms
8.6 Counterparts; Facsimiles
8.7 Expenses and Certain Taxes
8.8 Construction
8.9 Severability
8.10 Entire Agreement
8.11 Binding Effect; No Assignment
8.12 No Third-Party Beneficiaries
8.13 Cooperation
8.14 Access to Information
8.15 Use and Confidentiality

EXHIBITS

EXHIBIT A – ASSETS AND ASSUMED LIABILITIES
EXHIBIT B – SUPER OSJ AGREEMENT
EXHIBIT C -  CHARGES ABSORBED BY REPS
EXHIBIT D – FINANCIAL STATEMENTS
EXHIBIT E – FOCUS REPORTS
EXHIBIT F – COMPANY OWNERSHIP STRUCTURE

3

EXHIBIT G -- ADDITIONAL LICENSE JURISDICTIONS
EXHIBIT H -- REGISTERED REPRESENTATIVES
EXHIBIT I -- BROKERAGE ACCOUNTS
EXHIBIT J  -- ADVISORY SERVICE CONTRACTS
EXHIBIT K  -- INVESTMENT BANKING AGREEMENTS


SCHEDULES

SCHEDULE 3.1
SCHEDULE 3.2
SCHEDULE 3.4(A)
SCHEDULE 3.4(B)
SCHEDULE 3.4(C)
SCHEDULE 3.5
SCHEDULE 3.6
SCHEDULE 3.7
SCHEDULE 3.8
SCHEDULE 3.10

# BUSINESS TRANSFER AGREEMENT

This Business Transfer Agreement  (the "Agreement") is made and entered into as of the ___30th_____ day of November, 2016, by and among Source Capital Group, Inc. ("Source" or the "Company") and David W. Harris, ("David" or the "Shareholder"), 276 Post Road West, Westport, CT 06880  (Source and David are collectively called the "Transferor") and Advisory Group Equity Services, Ltd., and Trust Advisory Group, Ltd.,444 Washington Street, Woburn, MA 01801 (collectively called the "Transferee"),

<u>RECITALS</u>

WHEREAS David owns all of the issued and outstanding equity securities of Source;

WHEREAS David desires to transfer, and the Transferee desires to acquire the Business of Source upon the terms and conditions set forth in this Agreement; and,

WHEREAS, the parties intend that the Closing of the transfer transactions described in this Agreement shall take place upon receipt by the parties of the required Approvals, including approvals by the Financial Industry Regulaory Authority ("FINRA").

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Transferor and the Transferee hereby agree as follows:

## ARTICLE I.  TRANSFER  OF BUSINESS

1.1 <u>Transfer. .</u> On the terms and subject to the conditions set forth in this Agreement, the Transferor shall, subject to FINRA Approval, convey, assign, transfer and deliver to the Transferee, and the Transferee shall acquire from the Transferor, for the consideration specified in Section 2.1 hereof, all of the Transferor's right, title and interest in and to the Business of Source as more particularly described in <u>Exhibit A</u> attached hereto.

1.2 <u>No  Transfer of Tangble Assets or Assumption of Liabilities</u>. This Agreement contemplates solely a transfer of the Business of Source as defined in <u>Exhibit A</u>  and not a transfer of control or ownership of Source or any of its equipment, fixtures or other tangible assets. Neither the Transferee  nor any affiliates or  respective officers, directors, employees or agents is assuming any liability for or any debts, obligations or liabilities, of any kind or nature whatsoever, based upon, arising from, relating to, in connection with or attributable to  the Transferor, including any business, assets, or operations, whether arising prior to, at or after the Closing Date and including, without limitation: (i) any Federal, state or local tax liability; (ii) any liability arising out of any suit, action, cause of action or legal administrative, arbitration or other proceeding; (iii) any agreements, contracts or other obligations; (iv) any severance payments or liabilities associated with obligations to employees; and, (v) any liability associated with any benefit arrangement or employee plan.

5

## ARTICLE II.  CONSIDERATION

2.1  Consideration. The consideraton ( "Consideration")  provided by the Transferee to the Transferor in exchange for the Business shall be the establishment of a "Super OSJ" managed by David, Bruce C. Ryan and Richard H. Kreger as  OSJ Managing Principals ("the"OSJ Managers") as properly licensed registered representatives and principals of the Transferee, as those terms are defined by FINRA Regulations,   under identical OSJ Manager Agreements substantially in the form attached hereto as Exhibit B, with an initial  term of seven (7) years from the Closing Date and providing monthly cash payments to the OSJ Managers, allocated as provided in the OSJ Manager Agreements, in the aggregate equal to:

    (a) Ninety seven and one half percent (97.5%) of all Net Revenues, as defined below, received from investment banking, syndicate and primary offerings and any transaction on behalf of any issuer that is from a registration statement or unregistered offering, private placement, debt issuance, etc. "Net Revenues" shall mean gross revenues less all expenses associated with the business, including legal fees and other charges incurred by either party For the avoidance of doubt, all such expenses shall be paid for by the Transferee and deducted from gross revenues;

    (b) Ninety five percent (95%) of the net fees, commissions, and other revenues ) after clearing and execution charges, of all other Business generated by (i) registered representatives now licensed with Source who transfer their registrations to the Transferee plus (ii) all new representatives recruited by the OSJ Managers (collectively, "Source Representatives") from existing accounts of Source customers and clients (including money market accounts) , plus revenues from any new accounts obtained by them (collectively "Source Accounts") for as long as such representatives remain properly registered with the Transferee, in good standing with the Transferree and with FINRA and other regulators.  and such Source Accounts continue to be carried or advised by either of the Transferee or their representatives.

    (c) One hundred percent (100%) for the first seven (7) years subsequent to the Closing Date  and ninety five percent (95%) thereafter on margin interest, money market rebates, postage and handling participation, net ticket overages (representative charges per ticket in excess of clearing firm costs), administrative rebates for inactive accounts and annual retention bonuses for asset maintenance after clearing and execution charges, generated by Source Representatives from accounts (including money market accounts) formerly carried by Source and transferred to the Transferee as of the Closing Date,  plus revenues from any new accounts obtained by them. This provision shall exist for as long as such Source Representatives remain properly registered with the Transferee and in good standing and such Source Accounts continue to be carried by either of the Transferee or their representatives.

    (d) Source Representatives will be responsible for the charges described in Exhibit C which will be deducted from revenues payable to them.

Each  OSJ Manager  Agreement shall provide that the Source Representatives  shall receive no fees or commissions from any other business of the Transferee, including business currently or in the  future  conducted  by  the  Transferee  through  representatives  who  are  not  Source

Representatives or from accounts which are not Source Accounts The Transferee shall be under no obligation to initially license any Source Representative, other than Messrs. Harris, Ryan and Kreger or any representative proposed by any of them for recruitment, or to accept the transfer of any Source Account. The Transferee's obligations to Source Representatives under the OSJ Management Agreement, individual representative agreements or otherwise shall not require the Transferee to assign any particular account to, or to issue a license to or maintain the license of, any particular representative or otherwise prevent the Transferee from exercising its rights and responsibilities in managing operations in compliance with applicable laws and regulations.

2.2 Closing. The closing ("Closing") shall take place not more than (5) Business days following the issuance of all Required Approvals (as defined in Section 6.1) at a date mutually agreed upon by the Transferor and the Transferee, no later than December 31,2016 , unless extended by mutual agreement (the "Closing Date"). At or before the Closing, the parties shall effect the transactions described in Article VI. To the satisfaction of the Transferee in its sole discretion, all liabilities of Source, will be satisfied or provided for by the Transferor , Source shall surrender its broker dealer and investment adviser licenses and shall cease to conduct a securities business.      .

## ARTICLE III. TRANSFEROR'S REPRESENTATIONS AND WARRANTIES

Each party constituting the Transferor hereby represents and warrants to the Transferee, which representations and warranties shall be true and correct on the date hereof and on the Closing Date, as follows:

3.1 Status of Source

(a) Organization. Source is a corporation duly organized and validly existing in good standing under the laws of the State of Delaware and has full corporate power to own or lease its properties and conduct its business as now being conducted. True and accurate copies have been furnished to the Transferee of  (a) the Articles of Incorporation, as amended to date, (b) a Certificate of Good Standing from the office of the Secretary of State and dated as of recent date, and,(c) the By-Laws and any amendments thereto certified by the Secretary as in full force and effect. The  Company is duly qualified and in good standing to transact business as a domestic corporation and has paid all taxes and other fees due in each state or jurisdiction where it does business, except where the failure to so qualify and be in good standing would not have a material adverse effect on the Business of Source. Other than as set forth herein and in Schedule 3.1, Source has no subsidiaries or affiliates or equity securities of, investments in or loans or advances to any corporation, LLC, partnership, joint venture or other business enterprise or any agreements or commitments for such. The minute books of Source reflect all material actions and proceedings taken at meetings or by written consent of David or the Board of Directors and any committee thereof. The stock records of  Source accurately reflect all stock issuances and transfers of record.

(b) Capitalization; Ownership Interests. All outstanding shares of capital stock of Source are owned by David. No warrants, subscriptions, options, calls or other rights or commitments to issue or acquire any capital stock or other securities of Source or rights or obligations of any kind convertible into securities of any kind or class of each entity constituting Source are authorized, outstanding or otherwise existing.

7

(c) Authorization. The execution and delivery of this Agreement and the due consummation by the Transferor of the transactions contemplated by this Agreement have been duly authorized by all necessary action on the part of the Board of Directors and shareholder of Source in compliance with applicable laws and this Agreement constitutes the valid and binding agreement of Source and the Shareholder, enforceable against each of them in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and similar laws from time to time in effect and to general principles of equity.

(d) Effect of Agreement. The execution and delivery by the Transferor of this Agreement, the sale of the Assets and Business to the Transferee, the performance by each party constituting the Transferor of its or his  obligations pursuant to the terms of this Agreement and the consummation of the transactions contemplated hereby by the Transferor, do not and will not, with or without the giving of notice or lapse of time, or both:

i. violate or conflict with the Articles of Incorporation, By-Laws or any other charter documents of any entity constituting Source;
ii. violate or conflict with any provision of law, statute, rule, regulation, decree, or executive order to which any entity constituting Source or the  Stockholder  is subject or by which any of them is bound or affected (including rules and regulations of FINRA); or,
iii. violate or conflict with any judgment, order, writ, award or injunction or decree of any court, self-regulatory organization, arbitrator or administrative body specifically applicable to Source or David  and their respective Assets.

3.2 Financials.

The following representations and warranties shall be true and correct with respect to the financial statements referred to below as well as the financial statements for the annual and quarterly periods, respectively, next preceding the closing:

(a) Financial Statements. The financial statements of Source for the fiscal year ended December 31, 2015 attached as Exhibit D and the FINRA Focus Reports  for each of the ten (10) months ending with October 31, 2016 attached as Exhibit E together with all future reports and financial statements of Source required to be prepared, issued and filed at all times material (collectively defined as the "Company Financials") are and will be consistent in all material respects with the books and records of Source taken as a whole, have been prepared in accordance with generally accepted accounting principles applied on a consistent basis throughout the periods covered by such statements and fairly present the financial position of Source as of their respective dates and the results of operations of Source for the periods then ended.

(b) Absence of Undisclosed Liabilities. To the best knowledge of the Transferor, except as and to the extent stated  or reserved against in Source Financials or expressly described in the Notes thereto or fully disclosed on Schedule 3.2(b) (i.), and except for trade payables and similar liabilities and obligations arising in the ordinary course of Business since December 31, 2015, or which in the aggregate do not exceed $10,000, Source has and will have at the Closing Date no known liabilities or obligations of a type that would be required by generally accepted accounting principles to be accrued or otherwise stated  on a balance sheet (or the notes thereto) dated as of the Closing Date (depending on the status of FINRA arbitrations, FINRA regulatory actions, and the settlements of those cases, this statement might not be true.) and (ii.) no other material liability of any nature, whether accrued, absolute, contingent or otherwise, known or

8

unknown, not fully disclosed on Schedule 3.2 and arising from any state of facts existing on or before the Closing Date. In particular, Source has no liabilities or other obligations, existing or contingent arising from any independent operations or activities of David or any person named as a future OSJ Manager. At and after the Closing all liabilities of Source, as shown on Source Financials or otherwise, shall be and continue as Company Liabilities and, except as specified herein, the Transferee shall have no liability or obligation whatsoever as to any such liabilities.

(c) No Liabilities as Guarantor; Warranties. To the best knowledge of the Transferor neither Source nor David is directly or indirectly liable, by guaranty, surety or otherwise with respect to any debt, dividend or other obligation of any person, corporation, association, partnership or other entity, except endorsements made in the ordinary course of Business in connection with the deposit of items for collection.

(d) Absence of Certain Changes. Except as set forth in the Financial Statements or as contemplated by or disclosed in this Agreement, to the best knowledge of the Transferor, since the date of the latest Financial Statement, there has not been: (i) any material adverse change in the financial condition, Assets, liabilities or business of Source or David; (ii) any cancellation by any of them of any indebtedness owing to Source, or any other material waiver of any rights held by Source, or settlement of any dispute involving more than $100,000 and not disclosed on Schedule 3.2(c) ; (iii) any sale, assignment, transfer, license, disposition or lapse of any franchise, patent, license, trademark, trade name or copyright or other contract or intangible right of Source; (iv) any loan or advance by Source to any person, except a normal travel advance or other reasonable expense advance; (v) any capital expenditure or commitment by Source in excess of $1,000 for an individual project or $5,000 in the aggregate; (vi) any agreement or arrangement entered into by Source or any shareholder with any affiliate or associate or employee other than for reimbursement of ordinary and necessary expenses incurred in connection with employment; (vii) other than in the ordinary course of business, any sale or granting to any party or parties of any license, franchise, option, contract or other right of any nature whatsoever to sell, distribute, or otherwise deal in or with the product or services provided by Source or to use any license or permit, patent, trade name, trademark, service mark, copyright, pending applications therefor, trade secrets or other contract or proprietary rights of Source, or any agreement therefor; (viii) any new contract, agreement, commitment or understanding entered into by Source (other than for the purchase of raw materials, products, supplies and services and the sale of products and services entered into in the ordinary course of business) involving payment by or to Source of $1,000 or more individually or, when added to all others, $5,000 or more in the aggregate; or, (ix) any other transaction entered into by Source or David or any person named as a future OSJ Manager other than in the ordinary course of business.

3.3 Tax Returns; Taxes. To the best knowledge of the Transferors, Source has properly completed and filed, in correct form,  all Federal, state, municipal and other tax and related reporting returns of every nature required to be filed by it (the "Returns") and no extensions of time in which to file any such returns are in effect, except state and other returns with respect to which the failure to file would not subject either of them to liability in excess of $1,000 in the aggregate. Except as set forth in the Disclosure Schedule all amounts shown as due and payable have been paid and all accrued liabilities are properly reflected on the Financial Statements. Source has delivered to the Transferee true and correct copies of the Returns for the last three (3)

9

taxable years. Source has generally paid and/or satisfied on or before their respective due dates all income, sales and other taxes (whether or not requiring the filing of returns), including all deficiency assessments, additions to tax, penalties and interest of which notice has been received, to the extent that such amounts have become due, and none of such taxes, assessments or charges is delinquent.

3.4 Real and Personal Property.

(a) General. Source owns no real property. No personal property (including intangibles) shall be transferred to or acquired by the Transferee by virtue of this Agreement except as specified in Schedule 3.4(A) or specifically included in Exhibit A  Business.

(b) Leases; Subleases. At or before the Closing all Leases shall be cancelled, reassigned or otherwise dealt with to the Transferee's satisfaction so as to eliminate any liability or other legal exposure of the Transferee with respect to any such Lease.

(c) Documentation; Records. The products, services and systems provided or used by Source and included in the Business  are documented, and any software includes source code, manuals, operating system instructions and backup.  All software is written in standard language in accordance with normal industry standards and can readily be archived, accessed (subject to password and requirements retrieved and utilized by trained personnel) without the addition of codes, keys or other encryption or security devices not transferred or provided to the Transferee. At or before the Closing all  products, services, sysems and software, etc. not assigned to the Transferee  shall be cancelled, reassigned or otherwise dealt with to the Transferee's satisfaction so as to eliminate any liability or other legal exposure of the Transferee with respect to any such.

3.5 Contracts and Insurance.

(a) Contracts.  Schedule 3.5 identifies each written or oral contract, agreement, commitment or understanding to which Source or any person constituting the Transferor is a party or to which any of their properties is subject (each a "Contract") _which is included in the Business and is_ to be assigned to or assumed by the Transferee at the Closing (each such Contract a "Specified Contract"). The Transferor shall have no obligation to transfer nor shall any Transferee have any have any obligation to assume any Contract which is not a Specified Contract   Neither Source nor the David is in default in connection with any Specified Contract nor, so far as any of them knows, is there any basis for any material claim or default in, any respect under any such Contract; All Specified Contracts are fully transferable to the Transferee without prior consent of other parties otherwise than as specified in Schedule 3.5. At or before the Closing all Contracts other than Specified Contracts,  shall be cancelled, reassigned or otherwise dealt with to the Transferee's satisfaction so as to eliminate any liability or other legal exposure of the Transferee with respect to any such,  other than Specified Contracts.

3.6 Insurance.

(a) Schedule 3.6 accurately sets forth the policies which shall transfer at the Closing ("Specified Insurance") and those which shall cancel or be retained.  Source will continue to maintain insurance coverage of all such policies in full force and effect up to and including the Closing Date. All Specified Insurance is fully transferable to the Transferee without prior consent of other parties otherwise than as specified in Schedule 3.6. At or before the Closing all

10

such Insurance other than Specified Insurance shall be cancelled, reassigned or otherwise dealt with to the Transferee's satisfaction so as to eliminate any liability or other legal exposure of the Transferee with respect to any such, other than Specified Insurance.

(b) Schedule 3.6   accurately describes the errors and omissions policy(ies) in force covering Source and its registered representatives.  The Transferor  agrees to amend the policy(ies) so as to continue coverage for an Extended Reporting Period after  the Closing for errors or omissions occurring prior to the date of Closing and naming the Transferee  as additional insured(s).

3.7 Officers and Directors; Employment Relationships. Schedule 3.7 sets forth a list of all of the officers and directors of Source,  and a list of each employee of Source as of the date of the Schedule. At or before the Closing all such persons shall be terminated, reassigned or otherwise dealt with so as to eliminate to the Transferee's satisfaction any liability or other legal exposure of the Transferee with respect to any such person.

3.8 Transactions with Affiliates. Except as set forth in the Schedule 3.8 there is no lease, sublease, contract, agreement, commitment, understanding, or other arrangement of any kind whatsoever entered into by Source or any David with any Affiliated firm, person or corporation.

3.9 No Misleading Statements or Omissions. To the best of its knowledge no representation or warranty by the Transferor in this Article III or in any written exhibit, statement, certificate or agreement required to be furnished by the Transferors to the Transferee pursuant to this Agreement intentionally contains or will contain any untrue statement of a material fact, or intentionally omits or will omit to state a material fact necessary to make the statements herein or therein not misleading.

3.10 Litigation; Compliance with Law.

Other than as disclosed in Schedule 3.10:

(a) Neither Source nor David is engaged in or a party to or, to the best knowledge of either of them, threatened with any claim, controversy, legal action, or other proceeding whether or not before any court or administrative agency and whether by a private or public party, any adverse determination of which might adversely affect it or its business and, so far as either of them knows, there is no basis for such;

(b) No governmental authority in the last five years has (i) charged Source or David with the commission of a crime or (ii) given notice to Source or any David that it was conducting any investigation of which Source or David was the subject; and,

(c ) The Transferor has complied in all material respects with each Federal, state or other statute, law, judgment, order, decree, regulation or rule of any court or governmental authority applicable to it, including without limitation all trademark, copyright, antitrust and trade regulation laws, all communications laws, and all rules and regulations promulgated under such laws.

3.11 Absence of Restrictions and Conflicts. To the best knowledge of the Transferor, the

11

execution and delivery of this Agreement, the consummation of the transactions contemplated by this Agreement and the fulfillment of and compliance with the terms and conditions of this Agreement do not and will not with the passing of time or the giving of notice or both (a) constitute a violation of, conflict with, constitute a breach of or default under or result in the creation or imposition of any security interest, lien or other encumbrance, upon any of the Assets under (i) any term or provision of the articles of incorporation or bylaws or other similar basic document of Source; (ii) any agreement, commitment or understanding to which Source or David is a party or to which any of them or any of their properties is subject; (iii) any judgment, decree or order of any court or governmental authority or agency; or, (iv) any statute, law, regulation or rule, or (b) create, or cause the acceleration of maturity of, any debt, obligation or liability of the Transferors. No consent, approval, order or authorization of, or registration, declaration or filing with any governmental authority or other person, corporation, firm or entity with respect to the Transferor is required in connection with the execution or delivery of or the performance under this Agreement or the consummation of the transactions contemplated by this Agreement other than as set forth in the Disclosure Schedule or described elsewhere herein.

3.12 <u>Licensing</u>. Source is duly licensed and in good standing with each applicable regulatory authority to conduct its Business, including the license of Source Capital Group, Inc as a broker dealer and registered investment adviser and each of the Company's representatives is duly licensed and in good standing as a registered representative with FINRA and to the best knowledge of Source and David, Source and its representsatives hold all required licenses and permits to conduct the business done and intended to be done by each of them in each of the jurisdictions in which they do business. All such licenses are in full force and effect. At or prior to the Closing Source and the Transferor shall cancel all such licenses by completed filing of Form BD-W, Form ADV-W and issuance of Forms U-5 such that Source shall cease to be licensed to engage in any kind of securities business and the Transferee is able freely to re-license such representsives as it chooses as representatives of the Transferee with the Federal, FINRA, and state licenses they now hold withSource. While the Transferee agrees to cooperate with Source and David in the withdrawal, cancellation and re-licensing process, the Transferee shall have no responsibility or liability for the success or failure of any licensing withdrawal or transfer, all of which responsibility shall be and remain solely withSource and the Transferor.

3.13 <u>Governmental Approvals</u>. To the best knowledge of Source and David, no registration or filing with, or consent or approval of or other action by, any Federal, state or other governmental agency or instrumentality is or will be necessary for the valid execution, delivery and performance by the Transferors of this Agreement other than the FINRA Approval referred to in Section 6.1(a).

3.14 <u>Business Registrations</u>. The information contained in the most recent Form BD and Form ADV of Source, as amended to date, was and is true and complete at the time of the filing and as of the date of this Agreement. The Transferos has made and will make at all times material all amendments to such forms as shall be required under any applicable law.

3.15 <u>Brokers and Finders</u>. Neither Source nor David, nor any of the officers, directors, shareholder or employees of Source has employed any broker or finder or incurred any liability for any brokerage fees, commissions, finders' fees or similar fees or expenses and no broker or

finder has acted directly or indirectly for Source or David in connection with this Agreement or the transactions contemplatedby it.

## ARTICLE IV. TRANSFEREE'S REPRESENTATIONS AND WARRANTIES

Each entity constituting the Transferee hereby represents and warrants to the Transferor, which representations andwarranties shall be true and correct on the date hereof and as of the Closing Date, as follows:

4.1 <u>Execution, Delivery and Performance</u>. This Agreement has been duly and validly executed and delivered by the Transferee. This Agreement constitutes, and the Super OSJ Agreements shall, upon execution and delivery by the Transferee, constitute valid and binding obligations of the Transferee, enforceable against the Transferee in accordance with its terms, except insofar as enforcement hereof and thereof may be limited by bankruptcy, insolvency or similar laws affecting creditors' rights generally or the refusal of a court to grant equitable remedies.

4.2 <u>Effect of Agreement</u>. The execution and delivery by the Transferee of this Agreement, the Super OSJ Agreements and the performance by the Transferee of the Transferee obligations pursuant to the terms of this Agreement and the consummation of the transactions contemplated hereby by the Transferee, do not and will not, with or without the giving of notice or lapse of time, violate or be in conflict with any provision of law, statute, rule, regulation or executive order to which  the Transferee is subject; or violate or conflict with any judgment, order, writ, award or injunction or decree of any court, arbitrator or administrative body specifically applicable to the Transferee.

4.3. <u>Brokers and Finders</u>. The Transferee has not employed any broker or finder or incurred any liability for any brokerage fees, commission, finders' fees or similar fees or expenses and no broker or finder has acted directly or indirectly for the Transferee in connection with this Agreement or the transactions contemplated hereby, except to the extent that the Transferee acknowledges the broker/intermediary function and escrow agent role.

4.4   Registrations . As of the  Closing Date the Transferree  shall be  registered with FINRA, the  states specified on Schedule 4.4 and as a Registred investment adviser with the SEC.

## ARTICLE V. COVENANTS

5.1 <u>Covenants of the Transferor</u>. The Transferor hereby covenants and agrees between the date hereof and the Closing, to comply with the provisions of this Section 5.1, except to the extent otherwise required or permitted by this Agreement or required by any law, rule regulation or order:

5.1.1   <u>Due Diligence Period</u>. The parties shall have a "due diligence period" ending on December  15, 2016 (the "Due Diligence Period")  During the Due Diligence Period each of the Transferee and the Transferor will have the right to conduct a full "due diligence" investigation of the Transferee and the Transferor, respectively including but not limited to the

13

matters more particularly set forth in Section 3. If at any time the results of this "due diligence" investigation are unsatisfactory to the Transferee or the Transferor, in their sole discretion, then the party unsatisfied will have the option on or before the close of business on the last day of the Due Diligence Period to terminate the Purchase Agreement, without liability.

5.1.2 <u>Ordinary Course</u>. The Transferor shall conduct the Business and operations of Source only in the Ordinary Course and in a manner substantially consistent with Source and the Transferor's'' prior practice. "Ordinary Course" is defined as those operations detailed in the most recent Form BD, Focus Report and Form ADV of Source as filed.

5.1.3 <u>No Modification of Contracts</u>. Source and David shall not amend, terminate or otherwise modify or fail to perform in all material respects all of its obligations under any applicable agreements.

5.1.4 <u>No Transfers, Etc</u>. Source shall not, without prior notice in writing to the Transferee, assign, transfer, sell, lease, mortgage, pledge, encumber or dispose of any of its properties or assets, except in the ordinary and usual course of business and consistent with past practice.

5.1.5 <u>No Issue or Transfer of Securities</u>. Source and David shall not increase the authorized shares of any equity security of Source or issue any additional shares of any class of equity security or transfer any shares, without the prior written consent of the Transferee .

5.1.6 <u>Actions of the Transferor</u>. Source and the Transferor shall cooperate with the Transferee and use all commercially reasonable efforts to cause all of the conditions to the obligations of the Transferee and the Transferor under this Agreement to be satisfied on or prior to the Closing Date, including, without limitation, in obtaining the Required Approvals (as defined herein) and Third-Party Consents.

5.2 <u>Covenants of the Transferee</u>. The Transferee hereby covenants and agrees that between the date hereof and the Closing the Transferee will comply with the provisions of this Section 5.2, except to the extent otherwise required or permitted by this Agreement or required by any law, rule, regulation or order.

5.2.1 <u>Actions of the Transferee</u>. The Transferee shall cooperate with Source and David and use all commercially reasonable efforts to cause all of the conditions to the obligations of the parties under this Agreement to be satisfied on or prior to the Closing Date, including, without limitation, in obtaining the Required Approvals and any third party consents.

5.2.2 <u>Individual Business of Transferor's Representatives</u> . The registered representtives of the Transferor shall be entitled to receive from Source their current levels of fees and commissions on all business signed before the Closing. The Transferee shall have no responsibility or obligation for the payment of such commissions. The Transferee shall cooperate with the Transferor and the clearing firm(s) to facilitate the payment of such commissions by Source. All payouts to any such represntative shall be contingent on compliance by the representstive with Company WSPs and with FINRA requirements applicable to registered

14

representatives generally.

## ARTICLE VI. CONDITIONS OF CLOSING

6.1 <u>Conditions to Obligations of the Transferee</u>. Unless waived, in whole or in part, in writing by the Transferee, the obligations of the Transferee to close and effect the transactions contemplated by this Agreement shall be subject to the satisfaction at or prior to the Closing Date, as described in this Section 6.1 of each of the following conditions:

(a) <u>Required Approvals</u>. The parties shall have obtained all of the necessary governmental and self regulatory approvals or consents to this Agreement, including thenecessary state regsitratons as necessary,  and the transactions contemplated hereby including the approval of the Financial Services Regulatory Authority, Inc.. (the "FINRA Approval") (collectively the "Required Approvals"). The Transferee shall file with FINRA and use its best efforts to prosecute a Rule 1017 application covering both the Transferor and Transferee and containing such information about the Transferor as shall have been provided to it by the Transferor ( the "Transferor Information"). The Transferee shall have no responsibility/liability for the accuracy or acequacy of such Transferor Information. The Transferor agrees to indemnify and hold hamless the Tranferee from and against all loss, liability claim or expense arising from the provision of such Transferor Information.

(b) <u>Representations and Warranties to be True.</u> The representations and warranties of the Transferors contained in this Agreement shall be true and correct in all material respects on the Closing Date with the same effect as though made at such time. The Transferors shall have performed all of their obligations and complied in all material respects with all covenants required by this Agreement to be performed or complied with by them on or prior to the Closing Date.

(c) <u>Litigation.</u> No action, suit or proceeding shall have been instituted and be continuing, with the exception of the arbitrations listed on Schedule 3.2(b) or be threatened which shall materially and adversely affect Source or David or the carrying out of the transactions contemplated hereby, and no order to such effect of any court or governmental or regulatory body shall be in effect.  Existing litigation affecting Source and David shall be in a process of resolution satisfactory to the Transferee  with counsel, opinions and reserves satisfactory in the sole discretion of the Transferee, to  protect the Transferee from liability.   (d) <u>Filings.</u> At the Closing Source shall File a Form BD-W with FINRA  and a Form ADV-W with the SEC, as well as with the states where registered and shall cease to do business as a securities broker or dealer or investment adviser. Source's name shall be changed to  "RHKCapital LLC." or some other name acceptable to the Transferee, as a d/b/a or an affiliated entity, all at the sole expense of the Transferors. The Transferree's activities shall be limited to providing "back office" support services to the Super OSJ, with an ownership structure as Set forth in <u>Exhibit E</u>.

(e) <u>Licenses.</u>  The Transferee shall have become licensed as a broker dealer or investment adviser, respectively in each of the additional jurisdictions listed on <u>Exhibit G</u>. The Transferee shall have used its best efforts to facilitate the relicensing of David as described in Section 3.13.

(f) <u>Transfers and Assignments.</u>

(i) Licenses and registrations of all Source's registered representatives listed on <u>Exhibit H</u> (the "Source Representatives") shall have transferred from Source to one or more of the entities constituting the Transferee, with such changes as the Transferee shall have approved in writing, , subject to the terms

15

and conditions of Section 6.3.

(ii) Brokerage accounts of all the brokerage service clients of Source listed on Exhibit I shall have bulk transferred to Advisory Group Equity Services, Inc. on the books of Sterne Agee, Inc. and any other custody or clearing agency as specified, except as the Transferee shall have otherwise approved in writing

(iii) Source shall have assigned, and all the advisory service clients of Source listed on Exhibit J shall have consented, as required by the terms of their contracts and applicable laws and regulations, to the assignment, of their advisory service contracts to Trust Advisory Group, Ltd. except as the Transferee shall have otherrwise approved in writing.

(iv) Source shall have assigned, and all (A) the investment banking clients of Source and (B) all the selling and other agents of Source, as listed on Exhibit K, shall have consented, as required by the terms of their contracts and applicable laws and regulations, to the assignment, of their contracts to Advisory Group Equity Services,, Ltd. except as the Transferee shall have otherwise approved in writing. ( Doesn't make sense.  Shouldn't it be disapproved in writing?)

(v) The Transaferor shall have executed and delivered to the Transferee such addtional documents and done such other and additional acts and things in furtherance of the Closing as shall be reasonably requeted by the Transferee.

6.2 Conditions to Obligations of the Transferor. Unless waived, in whole or in part, in writing by the Transferor, the obligations of the Transferors to effect the transactions contemplated by this Agreement shall be subject to the satisfaction at or prior to the  Closing  to each of the following conditions:

(a) Representations and Warranties of the Transferee to be True. The representations and warranties of the Transferee contained in this Agreement shall be true and correct in all material respects on the Closing Date with the same effect as though made at such time. The Transferee shall have performed all of its  obligations and complied in all material respects with all covenants required by this Agreement to be performed or complied with by it on or prior to each Closing Date.

(b) Litigation. No action, suit or proceeding shall have been instituted and be continuing or be threatened which shall materially and adversely affect the Transferee or prohibit the carrying out of the transactions contemplated hereby, and no order to such effect of any court or governmental or regulatory body shall be in effect

(c) The Transaferor shall have executed and delivered to the Transferee such addtional documents and done such other and additional acts and things in furtherance of the Closing as shall be reasonably requeted by the Transferee.

6.3 Registered Representatives and Accounts. Effective upon the Closing and pursuant to the Super OSJ Agreement, the Transferor shall have appointed David Harris, Bruce Ryan and Richard Kreger, respectively, as OSJ Co-Managers of the Super OSJ and  branch offices of the Transferor, with the Source Representatives at assigned branch locations specified by the Transferee. . The individuals specified above shall have operational and control responsibilities or duties as specified by the Transferor. . All Source Representatives acceptable to the Transferee shall, agree to do business under supervision by the OSJ Managers and the Transferee, effective on and after the Closing, pursuant to registered representative and investment adviser

16

representative agreements acceptable to the Transferee and substantially in the forms attached as an exhibit to the Super OSJ Agreement. The new agreements shall have a term of seven (7) years, at the conclusion of which all representatives then licensed will revert to the payout grid then in effect unless otherwise negotiated. The new representative agreements shall specify the charges and expenses to be assumed by the Source Representatives, including those set forth in <u>Exhibit H</u>.  Upon completion of the Closing all existing representative Form U-5s shall be filed, all agreements with the Transferor shall terminate and new Form U-4s shall be filed and representative agreements shall, subject to the satisfaction of all regulatory licensing requirements, insurance and other conditions set forth in this Agreement, be immediately signed by the Transferee with Source Representatives being lcensed by the Transferee, all   in compliance with this Agreement and the Transferee's FINRA membership agreement and other regulatory filings.  Subject to the consent of the clients,  all advisory agreements and accounts of investment adviser representatives shall be assigned to Trust Advisory Group, Ltd.

Each Super OSJ Agreement shall remain in effect during the Manager's tenure as a registered representative of  the Transferee,  except for those clauses covering post termination obligations, which shall survive the termination of the OSJ Agreement. The Manager's services under the OSJ Agreement shall commence on the date thereof and shall terminate on the earliest of the following:

(a) the OSJ Manager's and co-managers' deaths, permanent disability. or adjudication of incompetency;

(B) Upon sixty (___60) days written notice of termination by either party to this Agreement to the other;

Notwithstanding the foregoing,
Any OSJ Manager Agreement may also be terminated by any party to that Agreement  as detailed in the form of  OSJ Manager Agreement   attached hereto as <u>Exhibit B</u> and made a part hereof.

## ARTICLE VII. TERM; TERMINATION; SURVIVAL OF REPRESENTATIONS, WARRANTIES, AND COVENANTS

7.1 <u>Term; Termination</u>. The term of this Agreement shall commence on the date of the signing of this Agreement.. Either the Transferor or the Transferee may terminate this Agreement (a) immediately, upon notice to the other party, if the Required Approvals and the Closing have not taken place by December 31, 2016 or such later date to which this Agreement may be extended by consent of the parties, or (b) upon not less than fifteen(15) days prior notice and opportunity to cure, if the other party is in default with respect to any of its obligations or the provisions of this Agreement. Should the Transferor choose to terminate this Agreement prior to or on December 31, 2016 based on (a) or (b) above, then it shall pay to the Transferree a fee of ten thousand ($10,000) dollars.  If the Transferor chooses to terminate it may request that  any OSJ Representatives transfer to a new firm. Subject to the receipt of the Termination Fee , the Transferee  shall not in any way oppose interfere with any such  transfer and assignment of such OSJ Representatives and their Source Accounts to any broker-dealer or investment adviser designated by the Transferor. The Transferee shall also proactively assist with such transfer in a

reasonable and helpful manner complying with all applicable rules and regulations.   In the event of termination each OSJ Representative may take customer or client information for all customers or clients whom they transferred to the Transferree.

7.2   Survival of Representations, Warranties and Covenants.   All representations, warranties and covenants of the Transferor and Transferee, including without limitation those contained in Articles III, IV, V, VI and VIII, shall survive for three (3) years from the Closing Date.

7.3   Indemnification by the Transferor.   David and Source hereby jointly and severally covenant and agree with the Transferee that the Transferor shall indemnify the Transferee and its respective successors and assigns (each, a "Transferee Indemnified Party") and hold them harmless from, against and in respect of any and all costs, losses, damages, claims, liabilities, fines, penalties (including interest which may be imposed in connection therewith, and court costs and reasonable fees and disbursements of counsel), excluding, however, special or consequential damages, (collectively "Losses") incurred by any of them in connection with:
(a) all liabilities of or claims against any Transferee Indemnified Party to the extent not expressly assumed by the Transferee pursuant to this Agreement or any Ancillary Agreement, arising out of or related to assets and Business or the conduct of the operations of the Transferor prior to the  Closing Date;
(b) any breach of, or any inaccuracy in any of the representations, warranties, covenants or agreements made by the Transferor in this Agreement, any Ancillary Agreement, or any certificate, instrument or document delivered pursuant hereto or thereto;
(c) any claims arising out of the conduct of the Transferor's ownership or operation of Source  at any time after the Closing Date; or
(c) any action, suit, proceeding, compromise, settlement, assessment or judgment arising out of or incidental to any of the matters indemnified against in this Section 7.3.

7.4   Indemnification by the Transferee.   Each of the parties constituting the Transferee hereby jointly and severally  covenants and agrees with the Transferor that the Transferee shall indemnify the Transferor and the Transferor's directors, officers, shareholders and affiliates, and each of their successors and assignees (each, a "Transferor Indemnified Party") and hold them harmless from, and against and in respect of any and all Losses incurred by any of them in connection with:
(a) any breach of or any inaccuracy in any of the representations, warranties, covenants or agreements made by the Transferee in this Agreement, the Ancillary Agreements, or any certificate, instrument or document delivered pursuant hereto or thereto;
(b) any claims arising out of the conduct of the Transferee' ownership or operation of the at any time after the Closing Date or,
(c) any action, suit, proceeding, compromise, settlement, assessment or judgment arising out of or incidental to any of the matters indemnified against in this Section 7.4.

7.5   No Indemnification.   No indemnification shall be available hereunder to any indemnified party to the extent that any such breach, claim or action against the indemnified party was caused in whole or in part by any breach of or any inaccuracy in any of the representations, warranties, covenants or agreements made by the party seeking indemnification

18

or by the conduct of that party's  ownership or operation of the Assets and Business during the applicable period.

7.6 <u>Notice and Opportunity to Defend.</u> Subject to provisions of Section 7.2 above, promptly after receipt by any Transferee Indemnified Party or Transferor Indemnified Party, as the case may be, (the "<u>Indemnitee</u>") of notice of any demand, claim or circumstances which, with the lapse of time, could give rise to a claim, or the commencement (or threatened commencement) of any action, proceeding, or investigation, which in either case could give rise to a right to indemnification pursuant to Section 7.2 or Section 7.3 (an "<u>Asserted Liability</u>"), the Indemnitee shall give the party who may become obligated to provide indemnification hereunder (the "<u>indemnifying party</u>") written notice describing the Asserted Liability in reasonable detail and indicating the amount (estimated, if necessary) of the Loss that has been or may be suffered by the Indemnitee (an "<u>Indemnification Notice</u>"). The indemnifying party may defend, at its own expense and by its own counsel, any Asserted Liability, and the Indemnitee shall cooperate in such defense against such Asserted Liability. If the indemnifying party fails to defend the Asserted Liability within thirty (30) days after notice thereof (or sooner if the nature of the Asserted Liability so requires) or contests its obligation to indemnify under this Agreement, the Indemnitee may pay, compromise or defend such Asserted Liability in a reasonable manner under the circumstances for the account, and at the expense of, the indemnifying party. Except as set forth in the immediately preceding sentence, neither the indemnifying party nor the Indemnitee may settle or compromise any claim  over the objection of the other; *provided, however*, that consent to settlement or compromise shall not be unreasonably withheld; *provided further*, that notwithstanding the foregoing provision, the indemnifying party may not settle or compromise any claim relating to taxes if such compromise or settlement would directly result in an increase in the tax liability of the Indemnitee which increase is not subject to indemnification under this Agreement. In connection with the defense of any claim, the Indemnitee shall make available to the indemnifying party any books, records or other documents and/or witnesses within its control that are necessary or appropriate for such defense. In addition, any indemnifying party shall be subrogated to the rights of the Indemnitee with respect to the respective Loss.

## ARTICLE VIII. MISCELLANEOUS PROVISIONS

8.1 <u>Certain Defined Terms</u>. As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Affiliate" shall mean, with respect to any person, any person which, directly or indirectly, controls, is controlled by, or is under common control with, the specified person. For purposes of this definition, the term "control" as applied to any person means the possession, directly or indirectly, of the power to direct or cause the direction of the management of that person, whether through ownership of voting securities or otherwise.

"Person" shall mean an individual, corporation, trust, partnership, joint venture, unincorporated organization, government agency or any agency or political subdivision thereof, or other entity.

8.2 <u>Notices</u>. All notices, requests, demands and other communications (collectively "Notices") given or made pursuant to this Agreement shall be in writing and shall be deemed to have been duly given if sent by telecopy or overnight courier, postage and fees prepaid, or otherwise actually delivered to any party at the address set forth below:

TRANSFEROR:

c/o Source Capital Group, Inc.
276 Post Road West
Westport, CT 06880
Att: David W. Harris, President
(203) 341-3515 (fax)
charris@sourcegrp.com

David W. Harris, individually
( same as above)

With a copy to:

Bruce Ryan
Richard Kreger
(same as above)


TRANSFEREE:

Advisory Group Equity Services, Ltd.
Trust Advisory Group, Ltd.
444 Washington Street, Suite 404
Woburn, MA 01801
Att; William  H. McCance, President
(781) 933-6100  (fax)
wmccance@tag-ages.com

With a copy to:

Geoffrey T. Chalmers, Esq.
33 Broad Street, suite 1100
Boston MA 02109
(617) 227-3709 (fax)
chalm@att.net


Any Notices shall be deemed duly given when received by the addressee thereof. Any of the parties to this Agreement may from time to time change its address for receiving Notices by giving written notice thereof in the manner set forth above.

8.3 <u>Waiver and Amendment</u>. No provision of this Agreement may be waived, amended, modified, cancelled, renewed or extended except in writing signed by all parties to this Agreement. No waiver on the part of any party of any right, power or privilege, nor any single or partial exercise of any such right, power or privilege, shall preclude any further exercise thereof or the exercise of any other such right, power or privilege.

8.4 <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts applicable to agreements made and to be performed in the Commonwealth of Massachusetts. Each of the parties hereby consents to the jurisdiction of the State and Federal courts in the Commonwealth of Massachusetts in connection with any claim, dispute or controversy arising under or in connection with this Agreement, or any ancillary agreement, and waives any objections based upon improper venue or *forum non conveniens*.

8.5 <u>Captions; Certain Terms</u>. The various captions and headings contained in this Agreement are for reference only and shall not be considered or referred to in resolving questions of interpretation of this Agreement. As used in this Agreement, the term "including" means "including but not limited to" unless otherwise specified; the word "or" means "and/or".

8.6 <u>Counterparts; Facsimiles</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument. An executed facsimile copy of this Agreement shall be enforceable as and to the same extent as an original executed agreement.

8.7 <u>Expenses and Certain Taxes</u>.

(a) Each of the parties shall pay its own expenses incurred in connection with the preparation of this Agreement and the consummation of the transactions contemplated hereby and all documents reasonably necessary to effectuate the terms and intent of this Agreement, including all accounting and legal fees.

(b) The Transferor shall be liable for and shall promptly pay any Federal, state or local sales, bulk transfer or transfer taxes, if any, payable in connection with the sale and assignment of the Assets and Business to the Transferee pursuant to this Agreement, and shall be responsible for the prompt filing of all tax returns or reports in respect thereof.

8.8 <u>Construction</u>. This Agreement shall be construed without regard to any presumption or other rules requiring construction against the party causing this Agreement to be drafted. If any words or phrases in this Agreement shall have been stricken or otherwise eliminated, whether or not any other words or phrases have been added, this Agreement shall be construed as if the words or phrases so stricken or eliminated were never included in this Agreement and no implication or reference shall be drawn from the fact that said words or phrases were so stricken or otherwise eliminated.

8.9 <u>Severability</u>. Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be or become prohibited or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating

21

the remainder of such provision or the remaining provisions of this Agreement.

8.10 <u>Entire Agreement</u>. This Agreement (including the Schedules and Exhibits attached hereto) and the Ancillary Agreements executed in connection with the consummation of the transactions contemplated hereby and thereby constitute the entire Agreement and understanding between the parties with respect to the transfer of the Assets and Business to the Transferee and the assignment of the Contracts to the Transferee, and supersedes all prior discussions, agreements, representations, warranties, projections and undertakings, written or oral, of any and every nature with respect thereto, including but not limited to the Letter of Intent dated May 15, 2007.

8.11 <u>Binding Effect; No Assignment</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, distributees, executors, administrators, personal representatives, successors and assigns.

8.12 <u>No Third-Party Beneficiaries</u>. Nothing in this Agreement is intended or shall be construed to give any person, other than the parties hereto and their heirs, distributee, executors, administrators, personal representatives, successors and permitted assigns any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein.

8.13 <u>Cooperation</u>. The Transferee and the Transferor shall cooperate, shall take such further action and shall execute and deliver such further documents as may be reasonably necessary to carry out the transactions contemplated by this Agreement including, without limitation, to obtain each of the Required Approvals and Third-Party Consents.

8.14 <u>Access to Information</u>. The Transferee and its respective attorneys, accountants and financial advisors will have full access during normal business hours to all employees, consultants, assets, properties, books, accounts, records, tax returns, contracts and other documents of Source, *provided*, however that such access will not materially interfere with the normal business operations of Source. In the event the parties terminate this Agreement for any reason each of the parties will promptly return to the others all documents and other materials so provided to it.

8.15 <u>Use and Confidentiality</u>. The disclosing party ("Discloser") is prepared to make available to the recipient ("Recipient") certain non-public or proprietary information which Discloser regards as confidential (the "Confidential Information"). Confidential Information shall consist of all information made available to Recipient by Discloser regarding the Discloser and its business, including customer information; provided, however, that for purposes of this agreement, Confidential Information does not include information which (a) was or becomes generally available to the public other than as a result of a disclosure by Discloser or (ii) was available to Recipient on a non-confidential basis prior to its disclosure by Discloser to Recipient. Recipient shall maintain the confidentiality of the Confidential Information in accordance herewith and shall not use the Confidential Information, directly or indirectly, for any purpose whatsoever other than for providing services to Discloser's business. Recipient shall not disclose the Confidential Information to any person or entity other than as directed by Discloser. Recipient shall inform such person or entity of the confidential nature of the Confidential Information, and shall use commercially reasonable efforts to ensure that such Confidential Information remains

confidential. In the event that Recipient is requested or becomes legally compelled to make any disclosure which is prohibited or otherwise constrained by this Confidentiality Agreement, Recipient agrees that it will (i) provide Discloser with prompt notice of such request(s) so that Discloser may seek an appropriate protective order or other appropriate remedy and/or waive compliance with the provisions of this agreement, and (ii) reasonably cooperate with Discloser in its efforts to decline, resist or narrow such requests. In the event Discloser is not successful in such efforts to decline, resist or narrow such requests, Recipient may comply with any such request or order..

**IN WITNESS WHEREOF**, each of the parties hereto has executed or caused this Agreement to be executed on its behalf by its officers thereunto duly authorized all as of the day and year first above written.

**TRANSFEROR:**

**SOURCE CAPITAL GROUP, INC.**

By:_____
      **David W. Harris, President**

_____
**David W. Harris, individually**

**TRANSFEREE:**

**ADVISORY GROUP EQUITY SERVICES, LTD.**

By:_____
      **William H. McCance, President**

**TRUST ADVISORY GROUP, LTD.**

By:_____
      **William H. McCance. President**

23

## EXHIBIT A – BUSINESS

All the Transferor's registered representatives

All customer account agreements

All investment advisory service and management agreements

All agreements with product and service providers as specified in the Purchase Agreement

All software and other systems currently in use by the Transferor and representatives as Specified in the Transfer  Agreement

All terminals, subscriptions and other services obtained by the Transferor and used currently by its representatives in the operation of the business

All solicitor and selling or other agreements, advertising and other programs in use by the Transferor related to the Business.

Any other contracts, services or arrangements used in the Business and more particularly specified in the Transfer  Agreement.

***The furniture, fixtures, equipment and other "hard assets" currently owned by the Transferor or its representatives are not included in the Business being transferred***

24

*The Transferee assumes no liabilities, stated or contingent, of the Transferor or any representative that are not specifically assumed in the Transfer Agreement.*

## EXHIBIT B – OSJ MANAGER AGREEMENT - FORM

### OSJ MANAGER AGREEMENT

#### [ DAVID HARRIS]

This OSJ Manager Agreement ("Agreement") is made and effective as of January 1, 2017 ("Effective Date"), by and between Advisory Group Equity Services, Ltd., a Delaware corporation, (the "Company" or "BD"), and David W. Harris ( the "OSJ Manager"). References to the "Company" and "BD" in this Agreement shall also include BD's affiliate, Trust Advisory Services, Ltd., a SEC Registered Investment Advisor and a Delaware corporation ("TAG").

BD desires to engage the OSJ Manager and the OSJ Manager desires to serve BD as Manager of "OSJ 3" one of BD's Offices of Supervisory Jurisdiction ("OSJs") as described below, subject to the terms and conditions set forth in this Agreement. The OSJ Manager shall serve as Co-Manager of the OSJ along with the other Co-Managers, Bruce C. Ryan and Richard H. Kreger.

1. **Engagement .** BD and the OSJ Manager hereby agree that the OSJ Manager shall serve as Co-Manager of BD's OSJ with the designation of *"Advisory Group OSJ No. 3"* located at 276 Post Road West, Westport, CT 06880 or a future location to be determined (the "OSJ"), effective as of the date of this Agreement. The OSJ Manager as an experienced FINRA registered supervisor shall co-supervise the operations of the OSJ as a FINRA - compliant office of supervisory jurisdiction in accordance with this Agreement, BD's written supervisory

procedures (the "WSPs" ) and FINRA regulations. The OSJ Manager shall perform the duties specified in Section 4 below and in Exhibit A attached as well as such duties as are required of the OSJ Manager by applicable federal and state regulations and any reasonable additional duties BD may assign from time to time. Except as provided below or as otherwise specified by BD in writing, the OSJ Manager and all personnel working in the OSJ agree to devote all their time (excluding permitted outside business activities and volunteering) and efforts during working hours to the performance of their duties for BD and during their service with BD they shall not, except as permitted above, directly or indirectly, act for the benefit of any person, firm, entity or corporation other than BD . The OSJ Manager also agrees that he is not now engaged in, nor during the period of his employment will he participate in any matter or otherwise engage in securities transactions other than through or on behalf of BD, or engage in any other business activity whatsoever without the prior written disclosure to, and assent by, BD

The OSJ Manager is a co-owner of RHK CAPITAL, LLC ("RHK"), a Connecticut limited liability company presently located at 276 Post Road West, Westport, CT 06880 serving as a support services firm for the OSJ. RHK constitutes an "outside business activity" of the OSJ Manager under FINRA regulations. RHK shall engage exclusively in the support services for the OSJ as specified in Exhibit B, not involving activities requiring registration as a broker dealer or investment adviser in any jurisdiction, under supervisory conditions established by BD. BD may examine and copy the books and records of RHK at any time.

The OSJ Manager shall report directly to the President and Chief Executive officer of BD. He shall share such supervisory duties of the OSJ with the other Co-OSJ Managers and supervisory responsibility over registered representatives ("RRs") and investment adviser representatives ("IARs") of BD and TAG, respectively ("OSJ" Representatives"), as are designated in writing from time to time by BD  and TAG and pursuant to the Written Supervisory Procedures ("WSPs")WSPs of each. All clients of OSJ Representatives are and will be customers maintaining brokerage accounts with BD assigned to these OSJ Representatives ("OSJ Accounts"). All broker-dealer services and investment advisory activities of these OSJ Representatives are and will be undertaken only with respect to OSJ Accounts. The OSJ Manager shall be responsible for overseeing the activities of these OSJ Representatives in their capacity of providing broker-dealer and investment advisory services and for maintaining books and records and supervisory procedures required by applicable laws and regulations and the WSPs.

The OSJ Representatives shall receive no fees or commissions from any other business of BD, including business currently or in the future conducted by BD through representatives who are not OSJ Representatives or from accounts which are not OSJ Accounts. If a representative is specifically recruited by Messrs. Harris, Ryan or Kreger or any OSJ Representative and licensed by BD ("Recruited Representatives ") or such accounts are obtained by any OSJ Representative or such Recruited Representative (thereby becoming "OSJ Accounts"), those representatives shall then be compensated by BD pursuant to agreed-upon compensation arrangements.. BD shall be under no obligation to  initially license any OSJ Representative, other than Messrs. Harris, Ryan and Kreger or any representative proposed by any of them for recruitment, or to accept the transfer of any account to any OSJ Representative. BD's obligations to OSJ Representatives under this Agreement, individual representative agreements or otherwise shall not require BD  to assign any particular account to, or to issue a license to or maintain the license of, any particular representative or otherwise prevent BD from exercising its rights and responsibilities in managing operations in compliance with applicable laws and regulations.

2. **Term.** This Agreement shall remain in effect during the OSJ Manager's tenure as a registered representative of BD, except for those clauses covering post termination obligations, which shall survive the termination of this Agreement. The OSJ Manager's services under this Agreement shall commence on the date hereof and shall terminate on the earliest of the following:

(a) the OSJ Manager's death, permanent disability or adjudication of incompetency;

(b) Upon 60 days written notice of termination by either party to this Agreement to the other party.

Notwithstanding the foregoing, BD may terminate this Agreement for cause at any time. Cause shall include, but not be limited to, the following acts or omissions by the OSJ Manager: dishonesty; insubordination; destruction of BD property; inability to obtain or retain self-regulatory or other necessary registration approvals; violation of any law governing BD's business or any rule or regulation of any regulatory or self-regulatory agency or organization having jurisdiction over BD; violation of the WSPs or any known and/or published policy or rule of BD; any arrest; any finding of civil or criminal liability; any other act or omission detrimental to the conduct of BD's business; failure to pay any amount due to BD or honor any obligation to BD; the OSJ Manager's inability to manage his own personal financial affairs; violation of any other terms of this Agreement.  Should any of these causes occur, BD must give notice to the OSJ Manager and allow 30 days to cure the alleged wrongdoing.  BD may immediately suspend the OSJ Manager from all or selective functions during the 30-day "cure" period, with or without compensation.

Upon termination of this Agreement the OSJ Manager shall observe the requirements set forth in Sections 8 and 9 below as applicable to the OSJ Manager, including return of all documentation, client relations and confidentiality and shall use his/her reasonable best efforts to cooperate fully with BD and any successor OSJ Manager in any transition. The provisions of Sections 9,10,12,15 and 22 shall survive termination.

3. **Compensation and Charges.**  BD agrees to Compensate the OSJ Manager on OSJ business, all as set forth in Exhibit C, Compensation and Charges.
    The OSJ Manager shall be compensated as an independent contractor and not an employee. Except as otherwise specifically provided, the foregoing compensation shall be reduced by reimbursements or payments due BD as provided below, for any amounts paid or payable by or due BD as agreed to by the parties for operational and other costs of the OSJ incurred, provided or advanced by BD.
    BD shall have no responsibility or liability for any fees, costs or expenses of the OSJ or RHK Capital,  LLC except as agreed to by the parties in advance in writing. The OSJ Manager shall indemnify and hold harmless BD, TAG, and their Officers, Directors, stockholders, employees, agents and contractors from any claims, costs or expenses of or involving the OSJ or RHK Capital,  LLC other than specifically so agreed.
    OSJ Manager shall have no responsibility or liability for any fees, costs or expenses of the BD except as agreed to by the parties in advance in writing.

27

The OSJ Manager agrees that BD may withhold any payments due the OSJ Manager for up to thirty (30) days following termination. BD may deduct from any payment, to the extent permitted by law, any reasonable amounts for which the OSJ Manager is then obligated to BD hereunder.

### 4. OSJ Manager and BD Responsibilities.

(a)   OSJ Operations. The OSJ Manager by virtue of such position shall be responsible for fulfilling the OSJ responsibilities described in this Agreement and exhibits and pay for, either directly or by deduction, at BD's discretion, from amounts due the OSJ Manager or otherwise, all the expenses not reimbursed directly by the OSJ Manager or OSJ Representatives and relating and/or attributable to the operation of the OSJ including but not limited to physical occupancy of office space, personnel, all personnel related costs and operating activities of the OSJ. OSJ Manager shall lease or otherwise provide at no cost to BD appropriate office space for the OSJ. BD, in its sole discretion shall have the right to approve such office space, which approval shall not be unreasonably withheld; and such approval shall include but is not limited to, the location, size of the facility and length of the lease. BD hereby approves the space presently being occupied by the OSJ as set forth above, provided that all books and records relating to the operation of the OSJ shall be kept at that location unless otherwise agreed in writing. The OSJ Manager, at the OSJ Manager's expense will provide appropriate working space for OSJ Representatives assigned to the space presently occupied by the OSJ. Similarly, subject to BD's approval, the OSJ Manager will, throughout the term of this Agreement furnish the OSJ with appropriate furniture, fixtures and equipment, including but not limited to telephone, computers, copier(s), facsimile and postage machine(s) and an interface with BD's operating systems. The OSJ Manager will make all the necessary agreements and arrangements with OSJ Representatives and others to provide and pay for any and all necessary services and supplies used in the normal course of a business including those services for mailgrams, overnight courier and messenger services and all stationery, forms and other supplies. The OSJ Manager shall be responsible for all OSJ costs not otherwise paid or reimbursed by the OSJ Representatives and incurred in connection with any and all OSJ client/customer related regulatory, self-regulatory, criminal or civil proceedings, including, but not limited to, fines and expenses of litigation. The OSJ Manager agrees that BD may withhold or deduct expenses or other payments incurred or made by BD from any amounts due the OSJ Manager

(b)   Regulatory Fees and Compliance. The OSJ Manager shall reimburse BD or TAG, upon request, for regulatory and compliance costs not otherwise paid or reimbursed by the OSJ Representatives and directly attributable to the OSJ including:

(i)   FINRA, SIPC, registration, registered representative, transaction or other miscellaneous fees;
(ii) licenses;
(iii) taxes;

The OSJ Manager agrees to comply with all applicable laws, regulations and rules which may be in effect during the term of this Agreement as it concerns the subject matter of

28

this Agreement and any costs related thereto, including but not limited to, securing and maintaining all appropriate work permits, and other documentation and clearances necessary for the lawful performance services, by all BD personnel performing such services in the OSJ.

(c) <u>Benefits.</u> The OSJ and OSJ Representatives will not be included in any of BD's benefit plans; however, pursuant to written agreement with BD , the OSJ Manager and OSJ personnel, at the OSJ Manager's expense, may be permitted to participate in BD's standard benefit plan(s), which participation is subject to all terms and conditions of the plan(s).

(d)    <u>Professional Liability Insurance.</u>   All OSJ personnel shall be covered by BD's professional liability (errors and omissions) insurance policy. In this regard, the OSJ Manager, to the extent not paid or reimbursed by the OSJ Representatives, shall pay to BD the per individual charge for each person.

**5. <u>Third Party Contracts.</u>** the OSJ Manager acknowledges that,  except as specifically set forth in the WSPs or authorized in advance in writing by BD,  the OSJ Manager lacks the authority to contract on BD's behalf or to otherwise incur debts or obligations for BD or to assign to, or accept assignment of , any contracts, debts or obligations on BD's behalf. The OSJ Manager warrants that, absent the prior written authorization of BD, the OSJ Manager shall not enter into any such agreements outside the normal course of business of the OSJ.

**6. <u>Compliance.</u>** In connection with all of the OSJ Manager's activities hereunder, the OSJ Manager shall comply with all applicable Federal State and local laws rules and regulations as well as the rules and regulations and interpretations of any of its industry self-regulatory organizations, states and other regulatory authorities of which BD is either a member or under jurisdiction thereof. The OSJ Manager shall comply with all WSPs.  The OSJ Manager shall be responsible for the due and proper licensing of all OSJ Personnel and for their compliance with the WSPS and other legal and regulatory requirements applicable to the Branch.

**7 . <u>Representations and Warranties.</u>** the OSJ Manager represents and warrants that he has the full authority to enter into and perform this Agreement. The OSJ Manager represents and warrants that,

( a) except as disclosed in writing to BD, (i) there are no prior or existing customer complaints in connection with any services or work performed by the OSJ Manager (ii) regulatory, self regulatory, administrative, civil or criminal matters or other impediments affecting the OSJ Manager's employment,

( b) the OSJ Manager is properly registered in all States in which he has been and will be doing business,

( c ) There are no circumstances, which will interfere with, or prevent, the OSJ Manager' s using his best efforts to perform the duties of the OSJ Manager for the  BD, and

(d) the performance of the terms of this Agreement will not conflict with or result in the breach of any other Agreement to which the OSJ Manager is a party or by which the OSJ Manager is bound.

**8. <u>Clients.</u>** BD Clients that are introduced by the OSJ Manager may, at the client's option become a client of the OSJ Manager upon closure of the OSJ and the resultant termination this Agreement, however if any client so chooses and is bound by a then current contract of any kind with BD, all fees, costs and expense reimbursements described in the contract shall be allocated between BD and the OSJ Manager according to the terms and conditions of this Agreement, as if the client, the OSJ Manager and BD/OSJ relationships continued unchanged.

BD  clients that are introduced by the OSJ Manager and serviced by BD from outside of the OSJ, remain clients of BD and under no circumstances may the OSJ Manager solicit any such client to engage the OSJ Manager in any capacity before the date which is the later of one (1) year after the expiration of such client's contractual commitment with BD, including any and all renewals thereunder or one(1) year after BD's receipt of the last form of consideration due under the terms and conditions of that client's engagement Agreement, contract or other legally binding form of commitment with BD ("Non-Compete Period"). Any negotiated allocation of BD's consideration, from such client to the OSJ Manager in the form of referral fees will continue after the termination of the OSJ Manager, in accordance with the terms and conditions of this Agreement.

The OSJ Manager agrees that during the Non-Compete Period, the OSJ Manager will not solicit or otherwise encourage any person working for or with BD,  employee or otherwise, to terminate his/her relationship with BD.,

After termination the OSJ Manager shall not use at any time or place, either directly or indirectly BD name or any of its trademarks, or any other marks so resembling BD's name or trademarks in any form or manner which could, or may likely cause any BD affiliation confusion, either by mistake or by intention deceive the public, which name, trademarks or marks shall include, but not be limited to,  alone or in combination with other words or names. the OSJ Manager agrees to destroy any and all stationary and other printed materials bearing the name of BD and/or any Company trademark.              .

## 9 . <u>Termination and</u> <u>Responsibilities Upon Termination of OSJ and/or BD.</u>

Post-closing of the transfer of the business of the  OSJ to BD expected December 31 2016 or as further extended, BD as Transferee is an independent broker dealer.  Subject to the receipt of a Termination Fee (defined as regulatory or clearing fees associated with transferring registered representatives  and accounts), BD as Transferee  will not place any impediment in the way of and  shall not in any way oppose the OSJ Manager or  interfere with the further transfer and re-assignment of any or all of the OSJ Representatives and their Source Accounts to any broker-dealer or investment adviser designated by the OSJ Manager.  BD shall also proactively assist with such transfer in a reasonable and helpful manner complying with all applicable rules and regulations. Each  OSJ  Representative  may  solicit    all  of  his/her  customers  or  clients

who transferred to the BD as Transferee or who they serviced while registered with the BD within the bounds of applicable regulations.

Upon termination of the OSJ, the OSJ Manager shall return all information and/or documentation including but not limited to all originals and copies of all summaries, records, descriptions, modifications, negatives, drawings, adoptions and other documents or materials, whether in writing or in machine-readable form, either received or created by the OSJ Manager or Company personnel under the OSJ Manager's direction or request and remove all signs, logos, and other identification of BD from the office premises and surrounding areas and, if requested by BD, return same to BD at the address listed below for contractual notices. With the prior written consent of BD in its sole and absolute discretion the OSJ Manager may make copies of documents for personal financial or regulatory needs so long as those documents are identified for the BD.

The OSJ Manager, upon request by BD and in connection with the OSJ closure, shall provide a certification that all documents, materials and any and all other items identified in this Agreement as documents, materials and items to be returned to BD upon termination of this Agreement have been delivered to BD.

**10. Confidentiality.** The disclosing party ("Discloser") is prepared to make available to the recipient ("Recipient") certain non-public or proprietary information which Discloser regards as confidential (the "Confidential Information"). Confidential Information shall consist of all information made available to Recipient by Discloser regarding the Discloser and its business, including customer information; provided, however, that for purposes of this agreement, Confidential Information does not include information which (a) was or becomes generally available to the public other than as a result of a disclosure by Discloser or (ii) was available to Recipient on a non-confidential basis prior to its disclosure by Discloser to Recipient. Recipient shall maintain the confidentiality of the Confidential Information in accordance herewith and shall not use the Confidential Information, directly or indirectly, for any purpose whatsoever other than for providing services to Discloser's business. Recipient shall not disclose the Confidential Information to any person or entity other than as directed by Discloser. Recipient shall inform such person or entity of the confidential nature of the Confidential Information, and shall use commercially reasonable efforts to ensure that such Confidential Information remains confidential. In the event that Recipient is requested or becomes legally compelled to make any disclosure which is prohibited or otherwise constrained by this Confidentiality Agreement, Recipient agrees that it will (i) provide Discloser with prompt notice of such req uest(s) so that Discloser may seek an appropriate protective order or other appropriate remedy and/or waive compliance with the provisions of this agreement, and (ii) reasonably cooperate with Discloser in its efforts to decline, resist or narrow such requests. In the event Discloser is not successful in such efforts to decline, resist or narrow such requests, Recipient may comply with any such request or order.

**11. Records.** The OSJ Manager shall be responsible for maintaining and retaining, in the OSJ, all OSJ records and other documents for the applicable period(s), as described in the WSPs and as required by the Securities and Exchange Commission, FINRA, state or local authority and/or any other regulatory or self-regulatory agency's rules and/or regulations.

**12. Communication Systems and Access to Information.** The OSJ Manager understands that he may receive access to BD's computer and electronic communications systems ("System" or "Systems"), which may include but are not limited to voicemail, e-mail, customer databases, internal computer systems, contracted computer systems, clearing firm systems, and Internet and intranet systems. Such systems are intended for legitimate business use related to BD's business. The OSJ Manager acknowledges that he does not have any expectation of privacy as between the OSJ Manager and BD regarding his use of or access to the Systems and that all communications made with or through such Systems or equipment by or on behalf of the OSJ Manager are subject to BD's review, use and disclosure, at BD's discretion. BD reserves the right, to monitor, review, audit, interpret, access, archive and disclose materials sent through or by means of, received by or from, or stored in any of the Systems. This includes, without limitation, email communications sent by users through the Internet and any intranet from and to BD domain or any other domain. This also includes, without limitation, any electronic communication system that has been used to access any of the Systems. the OSJ Manager further agrees that he will use all appropriate security, such as, for example, encryption and passwords to protect BD's confidential information from unauthorized disclosure (internally or externally) and that the use of such security does not give rise to any privacy rights in the communication as between the OSJ Manager, BD and any other party. BD reserves the right to override any security password to obtain access to any area of the System including but not limited to voicemail, email, computer (and software or other applications) and computer disks or other computer storage facilities. The OSJ Manager also acknowledges that BD reserves that right to examine and inspect (including reading any materials or documents) all work areas (for example, offices, cubicles, desks, drawers, cabinets, computers, computer disks and files).

**13. Consent to Injunction.** The OSJ Manager acknowledges that disclosure of Confidential Information by the OSJ Manager or breach of Section 8 of this Agreement may give rise to irreparable injury to BD, which is inadequately compensable in damages. Accordingly, BD may seek and obtain injunctive relief against the OSJ Manager for the breach or threatened breach of the foregoing undertakings, in addition to any other remedies that may be available. the OSJ Manager further acknowledges and agrees that the covenants contained herein are necessary for the protection of BD's legitimate business interests, are reasonable in scope and content and that such injunction shall not bar BD from seeking other remedies in connection with the conduct for which the injunction was sought and/or obtained.

**14. Background Checks.** The OSJ Manager agrees that BD has the right to require the OSJ Manager, OSJ Representatives and other personnel to submit to and hereby authorizes BD to conduct a reference, fingerprint or other background investigation with respect to regulatory and other legal considerations of BD or its affiliates, provided however, that nothing in this paragraph shall be construed as an obligation or duty to perform such an investigation

**15. Indemnification.**

   a.   The OSJ Manager shall indemnify and hold harmless BD, its officers, directors, employees, consultants or agents (each individually an "Indemnified Person"), from

32

and against any losses, claims, damages or liabilities, including any such losses, claims, damages or liabilities related to its investigation, and defense, to which such Indemnified Person may become subject arising out of or in connection with the rendering of services by the OSJ Manager; or by reason of any breach or alleged breach or failure of any of the representations, warranties, agreements or obligations of the OSJ Manager pursuant to this Agreement; or the OSJ Manager's breach or alleged breach of any duty, common law, Federal, state or local regulatory or self-regulatory authority's rules and regulations; or any alleged violations by the OSJ Manager which creates or may create liability for such Indemnified Person; or any regulatory or self-regulatory agency's inquiries, audits, arbitration or administrative proceedings of the OSJ Manager or OSJ accounts, whether or not resulting in any liability to such Indemnified Person and irrespective of the OSJ Manager's individual liability as disclosed in the findings.

The OSJ Manager shall reimburse such Indemnified Person for the reasonable legal and other
expenses as they are incurred, that arise in connection with investigating, preparing to defend or / defending any lawsuit, claim or proceeding and any appeals therefrom arising in any manner out of or in connection with the rendering of services by the OSJ Manager. This indemnificationprovision                                                                                shall survive the termination of this Agreement.

b.   The BD shall indemnify and hold harmlessthe OSJ Manager and his affiliates, employees, consultants or agents, including RHK Capital, LLC (each individually an "Indemnified Person"), from and against any losses, claims, damages or liabilities, including any such losses, claims, damages or liabilities related to its investigation, and defense, to which such Indemnified Person may become subject arising out of or in connection with the rendering of services by the BD; or by reason of any breach or alleged breach or failure of any of the representations, warranties, agreements or obligations of the BD pursuant to this Agreement; or the BD's breach or alleged breach of any duty, common law, Federal, state or local regulatory or self-regulatory authority's rules and regulations; or any alleged violations by the BD which creates or may create liability for such Indemnified Person; or any regulatory or self-regulatory agency's inquiries, audits, arbitration or administrative proceedings of the BD or OSJ accounts, whether or not resulting in any liability to such Indemnified Person and irrespective of the BD's individual liability as disclosed in the findings.

c.    The Registered Representative Agreement for each Source Representative assigned to and supervised by the OSJ shall contain cross indemnification paragraphs substantially similar to those in Section 15(a) and (b) above.

**16.   Successors and Assigns.**  The rights and benefits of BD under this Agreement shall be transferable to any successor entities and all covenants and agreements hereunder shall inure to the benefit of, and be enforceable by, BD's successors and assigns. The OSJ Manager may not assign this Agreement without the prior written consent of BD.

**17 . Governing Law.** This Agreement shall be governed and construed and enforced in accordance with the laws of the Commonwealth of Massachusetts without regard to conflicts of

laws provisions.

**18. Waiver and Amendment.** No waiver, amendment or modification of any provision of this Agreement shall be effective unless consented to by both parties in writing. No failure or delay by either party in exercising any rights, power or remedy under this Agreement shall operate as a waiver of such right, power or remedy. Any terms and/or conditions of this Agreement may be waived at any time, pursuant to this section, but a waiver in one instance shall not be deemed to constitute a waiver in any other instance.

**19. Severability.** In the event that any provision of this Agreement shall be held to be invalid, illegal or unenforceable in any circumstances, the remaining provisions shall nevertheless remain in full force and effect and shall be construed as if the unenforceable portions were deleted.

**20. Section Headings; Defined Terms.** Numbered and titled section headings and defined terms are for convenience only and shall not be construed as amplifying or limiting any of the provisions of this Agreement.

**21. Legal Representation.** BD reserves the right to select, at the OSJ Manager's expense, legal counsel to represent BD and the OSJ Manager if BD and the OSJ Manager are jointly named in an arbitration, legal action, regulatory or self-regulatory body inquiry investigation or enforcement proceeding, or customer complaint (collectively, the "Actions"). The OSJ Manager agrees to pay all legal fees incurred due to the actions or omissions for which the OSJ Manager is obligated to indemnify BD hereunder. BD agrees to pay all legal fees incurred due to the actions or omissions for which the BD is obligated to indemnify the OSJ Manager hereunder. The OSJ Manager shall have the right to retain separate counsel at the OSJ Manager's additional expense in the event an actual or potential conflict of interest would prevent joint representation of BD and the OSJ Manager or for any other reason.

**22. Arbitration.** Any claim or controversy arising out of or relating to this Agreement, or the interpretation thereof, or the OSJ Manager's termination of service hereunder shall be submitted to arbitration under the then prevailing Rules of the Financial Industry Regulatory Authority ("FINRA") and shall be conducted in Boston, Massachusetts. Judgment based upon decision of the arbitrators may be entered in any court having jurisdiction hereof. Any controversy relating to the OSJ Manager's duty to arbitrate shall also be arbitrated before FINRA. Any dispute submitted to FINRA arbitration under this provision must be decided based on applicable law and regulations. The OSJ Manager acknowledges that under this paragraph, the OSJ Manager waives his right to trial in a Court of Law.

**23. Notices.** All notices required by or permitted to be given under this Agreement will be in writing and will be deemed to have been duly given if and when (i) delivered personally; (ii) mailed by first class certified mail return receipt requested, postage prepaid; or (iii) sent by a nationally recognized express courier service, postage or delivery charges prepaid; and in all events will be deemed given upon receipt. All notices will be sent to the individual(s) immediately as set forth below and as respects the OSJ Manager, to both addresses, or to such other

address as may be designated by a party by giving written notice to the other party pursuant to this Paragraph.

**Addresses for Notices.**

**BD:**

Advisory Group Equity Services, Ltd.
Trust Advisory Group, Ltd.
444 Washington Street
Woburn, MA 01801
(781) 933-6100
Att: William H. McCance, President
wmccance@tag-ages.com

**The OSJ Manager:**

David W. Harris
276  Post Road West
Westport, CT 06880
(203) 341-3515 (fax)
[ E-MAIL ADDR]

24. <u>**Status as Independent Contractor**</u>    The relationship of the parties hereto is and shall be that of BD as  owner and the OSJ Manager as independent contractor.  Nothing contained herein shall be deemed or construed as creating the relationship of employer and employee, principal and agent, master and servant, partnership, or joint venture between the parties.  Other than as specifically provided in this Agreement, the OSJ Manager shall not, and agrees not to, represent himself as having any authority to make any warranties, representations, promises, undertakings, agreements or contracts in the name of, or binding upon, BD.

As an independent contractor, the OSJ Manager understands that, except as specifically set forth in this Agreement, he is not eligible for any benefits made available to Company employees. Unless so directed by authorities, BD agrees not to withhold from the OSJ Manager's commissions or other payments any deductions for taxes or similar government obligations imposed upon the OSJ Manager's income, and the OSJ Manager acknowledges that he is liable for payment of such.  The OSJ Manager understands that he is responsible for all his business licenses, self-employment taxes and related governmental obligations incidental to doing business as a representative. The OSJ Manager also agrees to inform BD of any arrangements, business or otherwise, in which the OSJ Manager is engaged and for which s/he receives compensation.

25. <u>**Entire Agreement.**</u> This Agreement embodies the entire understanding with respect to the subject matter hereof and cannot be changed or extended except by writing signed by the

OSJ Manager and a duly authorized officer of BD.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first set forth above.

**ADVISORY GROUP EQUITY SERVICES, LTD.**

By _____
      William H. McCance, President

**TRUST ADVISORY GROUP, LTD.**

By _____
      William H. McCance, President

**OSJ MANAGER:**

_____
      [NAME]

**OSJ EXHIBIT A –   OSJ DUTIES**

**[INSERT]**

**OSJ EXHIBIT B -  RHK  SUPPORT SERVICE FUNCTIONS**

**[INSERT]**

**OSJ EXHBIT C – COMPENSATION AND CHARGES**

      The OSJ Manager shall receive on a bi- weekly basis the following Compensation allocated collectively to all the OSJ
OSJ Managers, as follows:

(a) ninety seven and one half percent (97.5%) of all Net Revenues, as defined below, received from investment banking, syndicate and primary offerings and  any transaction on behalf of any issuer that is from a registration statement or unregistered offering, private placement, debt issuance, etc. "Net Revenues" shall mean gross revenues less all expenses associated with the business, including legal fees and other charges incurred by either party For the avoidance of doubt, all such expenses

36

shall be paid for by the Buyer and deducted from gross revenues;

(b) ninety five percent (95%) of the net fees, commissions, and other revenues generated from Stern Agee.

(c) One hundred percent (100%) for the first seven (7) years subsequent to the

Effective Date and ninety five percent (95%) thereafter on margin interest, money market rebates, postage and handling participation , net ticket overages (RR charges per ticket over SA costs), administrative rebates for inactive accounts and annual retention bonus for asset maintenance after clearing and execution charges, generated by OSJ Representatives from O S J Accounts (including money market accounts), for as long as such OSJ Representatives remain properly registered with BD and in good standing and such OAJ Accounts continue to be carried by BD

**CHARGES ABSORBED BY REPRESENTATIVES**
***THESE ARE CURRENT CHARGES , SUBJECT TO CHANGE AT ANY TIME IN THE DISCRETION OF BD***

Ticket charges  21.00
Custodial  charges  pass through
Execution fees  -pass through
eCustody fee pass through
Technology fee 80.00
Continuing education fee 75.00 per
FINRA and State registration fees pass through
E & 0 Insurance Cost 2013.11 per year
CIP/AML charges $4.00 per inquir

# EXHIBIT C – CHARGES ABSORBED BY REPS

***THESE ARE CURRENT CHARGES , SUBJECT TO CHANGE AT ANY TIME IN THE DISCRETION OF THE TRANSFEREE***

Ticket charges        21.00

Custodial charges   pass through

Execution fees pass through

eCustody fee pass through

Technology fee $80.00

Continuing education fee  $75.00 per

FINRA and State registration fees  pass through

E & O Insurance Cost   2013.11 per year
CIP/AML charges  $4.00 per inquiry

# EXHIBIT D – FINANCIAL STATEMENTS

**EXHIBIT E – FOCUS REPORTS**

## EXHIBIT F – COMPANY OWNERSHIP STRUCTURE

Source has 100 shares of Common Stock authorized of which 100 shares are issued and outstanding. All shares vote equally on corporate matters.

The stock ownership is as follows:

David W. Harris          100%

**EXHIBIT G – ADDITIONAL LICENSE JURISDICTIONS**

**EXHIBIT H – REGISTERED REPRESENTATIVES**

**EXHIBIT I – BROKERAGE ACCOUNTS**

**EXHIBIT J  -- ADVISORY SERVICE CONTRACTS**

**EXHIBIT K  -- INVESTMENT BANKING AGREEMENTS**

**SCHEDULES**

| | | |
|---|---|---|
| 3.1 | SUBS AND AFFILIATES | - None |
| 3.2(b) | LIABILITIES | - As stated in Oct 1, 2016 Focus Report |
| 3.2(c) | SETTLEMENTS | - None |
| 3.5 | CONTRACTS | -None |
| 3.6 | INSURANCE POLICIES | -None |
| 3.7 | OFFICERS, DIRECTORS, EMPLOYEES | – As stated in 1017 App. |
| 3.8 | AFFILIATE AGENTS | -None |
| 3.10 | ADVERSE CLAIMS | -As stated in 1017 App. |
| 4.4 | STATE REGISTRATIONS | -As stated in Brokercheck report |