UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RICHARD H. KREGER, BRUCE C. RYAN,
and RHK CAPITAL, LLC,

          Plaintiffs,

   v.

WILLIAM H. MCCANCE, SUSAN M.
LEMOINE, ADVISORY GROUP EQUITY
SERVICES, LTD., TAG GROUP, INC., and
TRUST ADVISORY GROUP, LTD. (f/k/a
Trust Advisory Services, Ltd.),

          Defendants.

Civil Action No. 3:21-cv-424 (CSH)

MAY 6, 2021

### RULING ON PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

**HAIGHT, Senior District Judge:**

Plaintiffs in this action move, pursuant to Federal Rule of Civil Procedure 65(b), for a temporary restraining order. *See* Doc. 4. The Court has duly conducted an expedited hearing, with counsel for the Parties having briefed the issues. This Ruling resolves Plaintiffs' motion.

### I. BACKGROUND

This diversity action involves the world of securities markets, peopled by investors who buy securities from or sell them to other investors, assisted in those pursuits by investment advisers, brokers, broker-dealers, clearing brokers, and registered representatives (who call investors "clients"). The securities industry is strictly regulated, principally by the Securities and Exchange Commission and the Financial Industry Regulatory Authority ("FINRA").

A broker-dealer company transacts in stocks, bonds, and mutual funds on behalf of its clients, and generates income from commissions on those transactions. An individual registered

1

representative affiliated with a broker-dealer company trades on behalf of clients and also is compensated for these services by receiving commissions on the trades.

At the time of filing the Verified Complaint, Doc. 1, and the First Amended Verified Complaint, Doc. 19 ("Am. V. Compl."), the two individual Plaintiffs—Richard H. Kreger and Bruce C. Ryan—were and remain registered broker-dealer agents of Noble Capital Markets, Inc., a registered broker-dealer, and investment adviser representatives of Noble Capital Management, Inc., a registered investment adviser (collectively, the "Noble Capital entities"). Am. V. Compl. at 3 ¶¶ 12–13. Kreger and Ryan are also members of the third Plaintiff, RHK Capital, LLC ("RHK"), a limited liability company. *Id.* at 2 ¶ 3. Defendant Advisory Group Equity Services, Ltd. ("AGES") is a registered broker-dealer. *Id.* at 3 ¶ 17. Defendant Trust Advisory Group, Inc. ("TAG") is a registered investment advisor. *Id.* at 3 ¶ 18. Defendant Tag Group, Inc. ("TGI") is the owner of AGES and TAG. *Id.* at 4 ¶ 19. The individual Defendant William McCance is a principal and the chief executive officer and president of AGES, TGI, and TAG. *Id.* at 3 ¶ 15. The individual Defendant Susan Lemoine is the chief operating officer and a principal of AGES and TGI. *Id.* at 3 ¶ 16.

According to the Verified Amended Complaint, the events giving rise to this action took place before Kreger and Ryan became affiliated with the Noble Capital entities.

On November 30, 2016, a Business Transfer Agreement ("BTA") was executed, whereby Defendants AGES and TAG acquired the "business" of Source Capital Group, Inc. ("Source"). *Id.* at 4 ¶ 20. This "business" was defined as including, *inter alia*, all Source registered representatives, all Source customer account agreements, and all Source investment advisory service and management agreements. *Id.* at 4 ¶ 21; *see also* Doc. 18 ("Def.'s Mem.") Ex. A.

Plaintiffs allege that, in consideration for the transfer of Source's "business," AGES and

TAG agreed to enter into a separate series of contracts establishing a "Super OSJ"[1] owned and managed by Kreger and Ryan, as well as a third individual named David Harris,[2] and guaranteed to them certain monthly cash payments. *Id*. at 3 ¶¶ 12–13; 4–5 ¶¶ 22, 24. Plaintiffs refer to these contracts as the "OSJ Manager Agreements." *Id*. The OSJ Manager Agreements form the basis for Plaintiffs' claims against Defendants.

Although disputed by the Parties, *see* Def.'s Mem. at 2, 4–8, the BTA and its accompanying OSJ Manager Agreements may have become operative in early 2017. The Parties subsequently lived together in apparent harmony until, on November 30, 2020, McCance—on behalf of AGES and TAG—gave a 60-day written notice to Kreger and Ryan that he was terminating the OSJ Manager Agreements, effective February 1, 2021. Am. V. Compl. at 6–7 ¶¶ 29–30.

Plaintiffs claim that they "were induced to enter into the OSJ Manager Agreements by Paragraphs 8 and 9 of those agreements." *Id*. at 5 ¶ 25. Plaintiffs' theory of the case is that, collectively, "[t]he provisions in paragraphs 8 and 9 . . . allowed [Plaintiffs] to terminate or suffer termination of the agreement without the worry that their agents, clients, and customers would [not] be free to move to a new broker-dealer and investment advisor without interference from the Defendants and, in fact, with affirmative aid from the Defendants." *Id*. at 6 ¶ 28.

More specifically, Paragraph 8 provides, in part: "AGES or TAG clients introduced to those entities by the OSJ Manager may, at the client's option, become a client of the OSJ Manager upon closure of the OSJ . . . however, if any client so chooses and is bound by a then current contract of any kind with [AGES and TAG], all fees, costs and expense reimbursements

---

[1] "OSJ" stands for "Office of Supervisory Jurisdiction," an entity which "operates independently of its sponsoring broker-dealer and pays a fee to the broker-dealer for administrative and compliance services." Am. V. Compl. at 4 ¶ 22.

[2] Plaintiffs allege David Harris's interest in the "Super OSJ" later was transferred to RHK. Am. V. Compl. at 4 ¶ 23.

described in the contract shall be allocated . . . as if the client, the OSJ Manager, and the [AGES/TAG]/OSJ relationships remained unchanged." *Id*. at 6 ¶ 26; *see also* Doc. 1-2 at 6. Plaintiffs maintain that, under the terms of Paragraph 8, Kreger and Ryan are to continue receiving portions of income generated by the operation of accounts previously existing with Source, or from new accounts recruited by OSJ Managers that remain with AGES and TAG. *See* Doc. 3 (Ryan Decl.) at 2 ¶ 8; Am. V. Compl. at 8 ¶ 34(h).

Paragraph 9 of the OSJ Manager Agreements, meanwhile, provides in part that AGES and TAG "will not place any impediment in the way of and shall not in any way oppose the OSJ Manager or interfere with the further transfer or reassignment" of OSJ representatives and their Source accounts "to any broker dealer or investment adviser designated by the OSJ Manager," and "AGES and TAG shall also proactively assist with such transfer in a reasonable and helpful manner complying with all rules and regulations." Am. V. Compl. at 6 ¶ 27; *see also* Doc. 1-2 at 6. Plaintiffs claim that Paragraph 9 "allowed the OSJ to affiliate with a new broker-dealer or investment advisor without any restriction on the transfer of accounts of the former Source customers and clients . . . It also creates an affirmative duty for AGES and TAG to refrain from hindering the transfer of accounts in any way and to assist in the transfer." Doc. 4-1 ("Pl.'s Mem.") at 5.

Plaintiffs do not question Defendants' right of termination. Kreger and Ryan allege that they "immediately identified a broker-dealer with which they wanted to affiliate"—i.e., the Noble Capital entities—and that they promptly notified Defendants of the new affiliation. Am. V. Compl. at 7 ¶ 31. However, Plaintiffs claim that, subsequent to Kreger's and Ryan's reaffiliation with the Noble Capital entities, Defendants have breached the surviving terms of the OSJ Manager Agreements in two respects: (1) by failing to make payments purportedly owed to

4

Plaintiffs based on OSJ representatives' business originated under the OSJ Manager Agreements, in violation of Paragraph 8; and (2) by impeding or failing to proactively assist the transfer of relationships and client accounts to the Noble Capital entities, in violation of Paragraph 9. *Id*. at 7–8 ¶¶ 34–39.

Plaintiffs move for a Temporary Restraining Order ("TRO") and pray for the correction and alteration of Defendants' conduct in these regards.

## II. DISCUSSION

### A. Temporary Restraining Orders in FINRA Matters

The Parties dispute important aspects of their relationship. Defendants do not agree that they ever contracted with Plaintiffs in the manner alleged in the Amended Verified Complaint, or, in the alternative, that they have breached that contract. *See generally* Def.'s Mem. at 4–10. There is no dispute, however, that these issues presently are subject to arbitration before a FINRA panel of arbitrators, who will decide the merits of Plaintiffs' underlying claims and Defendants' defenses to them.

Why, then, is the case before this Court, on a motion by Plaintiffs for a TRO? The answer lies in Rule 13804 of the FINRA Code of Arbitration Procedure for Industry Disputes. Under that Rule, an arbitration claimant may seek interim injunctive relief from a court of competent jurisdiction while a FINRA arbitration hearing is pending. *See* FINRA Arb. Proc. R. 13804(a)(1).[3] Plaintiffs invoke Rule 13804 in their motion to this Court for a TRO.

Rule 13804 further provides for an expedited arbitration hearing, to be scheduled within fifteen days of the Court's issuance of interim relief. FINRA Arb. Proc. R. 13804(b)(1). If the Court declines to grant a TRO, however, the arbitration of the Parties' underlying disputes will

---

[3] The Court takes judicial notice that Rule 13804 and other FINRA arbitration rules are available at the following web address: https://www.finra.org/rules-guidance/rulebooks/finra-rules/13000.

5

proceed before FINRA arbitrators in the ordinary, non-expedited manner. Doc. 22 ("Hr'g Tr.") at 17:8–17:12. Counsel for Plaintiffs acknowledged at this Court's hearing on Plaintiffs' motion that if Plaintiffs succeed on the merits of their claims in the FINRA proceeding, the arbitrators at that time will have the power to grant Plaintiffs all the forms of relief Plaintiffs seek *now* in the TRO. *Id.* at 17:12–17:14, 24:22–24:24, 45:3–45:10. Plaintiffs nonetheless invoke Rule 13804 to seek a TRO from this Court for the purpose of obtaining an expedited arbitration hearing. *Id.* at 15:15–15:19.

Whether to issue or deny interim injunctive relief, by temporary restraining order or preliminary injunction, is a much-litigated question. The standard of review in this Circuit is established by decisions of the Supreme Court and the Second Circuit. *See infra* Part II.B. Courts in this District apply that standard of review when asked to issue interim injunctive relief pursuant to FINRA Rule 13804. *See, e.g.*, *Westport Res. Mgmt., Inc. v. DeLaura*, No. 3:16-cv-873, 2016 WL 3546218 (D. Conn. June 23, 2016); *Morgan Stanley Smith Barney, LLC v. O'Brien*, No. 3:13-cv-1958, 2013 WL 5962103 (D. Conn. Nov. 6, 2013).

**B. Standard of Review**

The principal forms of preliminary injunctive relief are a preliminary injunction and a temporary restraining order. *See generally* Fed. R. Civ. P. 65. "[T]he traditional standards which govern consideration of an application for a temporary restraining order . . . are the same standards as those which govern a preliminary injunction . . . ." *Loc. 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n*, 965 F.2d 1224, 1228 (2d Cir. 1992).

"A preliminary injunction is an extraordinary remedy never granted as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (Roberts, C.J.) (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). "The preliminary injunction 'is one of the most drastic tools in the

arsenal of judicial remedies.'" *Grand River Enter. Six Nations v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quoting *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir.1985)).

In the Second Circuit, district courts generally may grant preliminary injunctions when the plaintiff shows "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). *See also Trump v. Deutsche Bank AG*, 943 F.3d 627, 635 (2d Cir. 2019), *cert. granted*, 140 S. Ct. 660, 205 L. Ed. 2d 418 (2019), *and rev'd and remanded on other grounds sub nom. Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 207 L. Ed. 2d 951 (2020); *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 215 (2d Cir. 2012); *MyWebGrocer, L.L.C. v. Hometown Info., Inc.*, 375 F.3d 190, 192 (2d Cir. 2004).[4]

"Irreparable harm is 'the single most important requisite for the issuance of a preliminary injunction.'" *Demirayak v. City of New York*, 746 F. App'x 49, 51 (2d Cir. 2018) (summary order) (citing and quoting *Bell & Howell Mamiya Co. v. Masel Supply Co. Corp.*, 719 F.2d 42, 45 (2d Cir. 1983)). "Our frequently reiterated standard requires plaintiffs seeking preliminary relief to show that irreparable injury is *likely* in the absence of an injunction. . . . Issuing a

---

[4] The Court notes that in recent opinions the Second Circuit has described the standard for preliminary injunctive relief differently, stating that the movant "must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm if the injunction is not granted, (3) that the balance of the equities tips in its favor, and (4) that the injunction serves the public interest." *SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 273–74 (2d Cir. 2021) (citing *Winter*, 555 U.S. at 20). *See also Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 188 n.2 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 256, 205 L. Ed. 2d 134 (2019) (citing *Winter*, 555 U.S. at 20). In omitting the "second 'serious questions' prong [which] is also frequently termed the 'fair ground for litigation' standard," *Able v. U.S.*, 44 F.3d 128, 131 (2d Cir.1995), this standard is more rigorous because it requires the movant to show likelihood of success on the merits; it furthermore requires the Court to consider whether the injunction would serve the public interest. Because the case at the bar does not involve governmental action, the Court will apply the more traditional standard set forth in *Citigroup Global Markets*. *Cf. Trump*, 943 F.3d at 637 ("With slightly different formulations, [the Second Circuit has] repeatedly stated that the serious-questions standard cannot be used to preliminarily enjoin governmental action."). Even if the Court were to employ the *Winter* standard, however, the outcome of the present decision would be no different, for the reasons set forth *infra*.

preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter,* 555 U.S. at 22 (citations omitted).

Irreparable harm is one that not only is likely but also "cannot be remedied by an award of monetary damages." *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 97 (2d Cir. 2005); *see also Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) ("Irreparable harm is an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation." (citation and internal quotation marks omitted)).  "[W]here monetary damages may provide adequate compensation, a preliminary injunction should not issue." *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995). Even "substantial" injuries "in terms of money, time and energy necessarily expended in the absence of a stay" are not considered "irreparable," given "the possibility that adequate compensation or other corrective relief will be available at a later date, in the ordinary course of litigation." *Id.* at 39 (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)).

### C. Application of These Principles to This Case

It is immediately apparent that, to the extent Plaintiffs base this action upon Defendants' alleged failure to make payments Plaintiffs claim are owed pursuant to Paragraph 8 of the OSJ Management Agreement, a temporary restraining order is not available.  Should Plaintiffs succeed on that claim in the FINRA arbitration, there is no reason to suppose that the arbitrators would not give Plaintiffs full compensation for these unpaid amounts, in the form of an award of the payments Defendants should have made plus appropriate interest.   On this aspect of the case, where the remedy of money damages is plainly available, Plaintiffs have not shown that

irreparable injury, as defined by the cases, is even possible, let alone likely.

The remaining area of controversy has to do with the transfers and reassignments of former Source customers, clients and representatives from the Defendants, where Kreger and Ryan used to work, to the Noble Capital entities, to which Kreger and Ryan repaired after McCance allegedly terminated the Defendants' OSJ Manager Agreements with Kreger and Ryan. The Parties' submissions indicate that Kreger and Ryan are attempting to attract these sources of securities business to themselves and the Noble Capital entities, while the Defendants by various means are attempting to retain that business. Neither effort is particularly surprising in a competitive world.

On Plaintiffs' theory of the case, Defendants' efforts in this regard violate Paragraph 9 of the OSJ Management Agreement. *See* Am. V. Compl, at 7–8 ¶¶ 33–34, 38. Plaintiffs ask the Court in their TRO motion, *inter alia*, to enjoin Defendants from impeding the transfers and reassignment of the clients in question; to order Defendants to proactively assist Kreger and Ryan in transferring the relationships and client accounts to the Noble Capital entities; and to order Defendants to facilitate the "bulk transfer" of relationships and client accounts from AGES and TAG to the Noble Capital entities. *Id.* at 9–10 ¶¶ 1–3.

Defendants deny that they have engaged in any conduct violating the Parties' agreement (assuming such agreement exists), and further respond that Plaintiffs in their Noble Capital *personae* are entirely at liberty to acquire those clients who are willing to join them. Def.'s Mem. at 8, 10; Hr'g Tr. at 28:17–29:12, 30:6–30:7. Defendants additionally contend that there are procedures readily available for Plaintiffs to implement such transfers, without any input by Defendants—namely, the Automated Customer Account Transfer Service ("ACATS"), an industry-standard system that Defendants characterize as neither cumbersome, time-consuming,

nor expensive. Def.'s Mem. at 10. Ms. Patzer, who argued the case for Defendants, said at the hearing: "If we receive the ACAT[S] transfer, we do it. That's actively assisting. We have not impeded anyone or anything. Their only impediment, quite frankly, Your Honor, is that they are too lazy to fill out new account applications." Hr'g Tr. at 48:11–48:15.

As for a "bulk transfer" of clients' accounts from Defendants to the Noble Capital entities, which Plaintiffs desire and ask the Court to direct, Defendants contend that FINRA rules prohibit such transfers except in particular circumstances that are not present in this case. Def.'s Mem. at 8–10.

The foregoing are merits issues that the FINRA arbitrators will eventually resolve. The question presented by Plaintiffs' TRO motion remains the same: Does Defendants' conduct, assuming that it breaches the OSJ Manager Agreements, create the likelihood of irreparable injury to Plaintiffs?

On this point, Plaintiffs argue that "[t]he damage the Defendants are causing by actively soliciting agents, customers and clients and interfering with the Plaintiffs' ability to transfer these accounts and individuals 'cannot be repaired with money.'" Pl.'s Mem. at 11. For that proposition, Plaintiffs' brief cites and quotes *Elizabeth Grady Face First, Inc. v. Escavich*, 321 F. Supp. 2d 420, 423 (D. Conn. 2004), where a former employee of the plaintiff employer violated a non-compete agreement in the employment contract by soliciting and servicing plaintiff's customers, and identifying them to defendant's new employer. Judge Underhill, issuing a TRO, reasoned: "[These] things are likely to diminish Elizabeth Grady's existing customer base and decrease its goodwill. Such damages cannot be repaired with money." *Elizabeth Grady*, 321 F. Supp. 2d at 423.

On the question of irreparable harm *vel non* in this case, *Elizabeth Grady* offers no

meaningful guidance.  Plaintiffs at bar bear no resemblance to an employer deprived of customers by a former employee's illicit conduct in breach of a non-compete contractual provision; nor do Defendants resemble such a faithless former employee.  *Westport Resources Management* and *Morgan Stanley*, cited *supra*, which also involved non-compete or non-solicitation clauses in employment contracts, are distinguishable for the same reason.  In *Westport Resources Management*, Judge Bolden said in granting a TRO *to the former employer*: "Courts in the Second Circuit consistently have held that when a party violates a non-compete clause, resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm."  *Westport Res. Mgmt.*, 2016 WL 3546218, at *4.  These cases do not support Plaintiffs' claim, in an entirely different context, that Defendants' conduct respecting clients and representatives subjected Plaintiffs to irreparable harm.  Defendants, unlike the faithless former employees in the cited cases, have not illicitly acquired clients from Plaintiffs.  Defendants in this case are trying to retain clients they have supported as the broker-dealer standing behind Kreger and Ryan's OSJ arrangement, in the face of the *Plaintiffs'* efforts to move them.

Moreover, the facts reflected by the present record militate against a finding of irreparable injury to Plaintiffs.  Plaintiffs' construction of Paragraph 9 of the OSJ Manager Agreements has to be that when AGES and TAG agreed to "not place any impediment in the way of" or "oppose" or "interfere with" transfers or reassignments of clients' accounts designated by an OSJ Manager, the Defendant companies also agreed by implication not to try to persuade the clients in question to stay where they are, with the Defendants.  This construction of the contract term is something of a stretch, but even if one accepts it, and also accepts that Defendants are wrongfully refusing to make a block transfer under the OSJ Manager

11

Agreements, the Court agrees with Defendants that Plaintiffs are nonetheless able, by the exercise of their own personal efforts, to obtain transfers of accounts to them through the ACATS system. Plaintiffs will have to persuade clients to transfer to the Noble Capital entities for these ACATS transfers to occur, but the Court agrees with Defendants that this is a requirement they face in any event: FINRA's rules and publicly available guidance evidently contemplate that *clients* will direct the transfers of their accounts between broker-dealers. *See* FINRA Uniform Prac. Code R. 11870; *see also* FINRA, Key Topics: Customer Account Transfers, https://www.finra.org/rules-guidance/key-topics/customer-account-transfers (last visited May 5, 2021) (collecting FINRA materials regarding transfers of customer accounts).

In order to achieve their commercial purposes, Plaintiffs may have to incur greater effort and expense than they anticipated, but under the circumstances those consequences do not add up to "irreparable harm." It also seems to me likely that if the FINRA arbitrators agree with all of Plaintiffs' claims, they will be able to calculate the several elements of Plaintiffs' damages and losses, and fashion an award that will constitute full and adequate compensation.

### III. CONCLUSION

Having considered the facts as revealed by the record, and the governing authorities, I conclude that Plaintiffs have failed to make the requisite showing that they will suffer irreparable harm if the Court does not issue the prayed-for preliminary injunctive relief.

Consequently, the Plaintiffs' Motion for a Temporary Restraining Order, Doc. 4, is DENIED. The Clerk is directed to close the file. It is SO ORDERED.

Dated: New Haven, Connecticut
May 6, 2021

*s/ Charles S. Haight, Jr.*
CHARLES S. HAIGHT, JR.
Senior United States District Judge
